UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DWINEL MONROE,

                                        Plaintiff,

                    -v-

SUPERINTENDENT KATHLEEN GERBING,
OTISVILLE CORRECTIONAL FACILITY;
COMMISSIONER ANTHONY J. ANNUCCI; CARL
J. KOENIGSMANN, CHIEF MEDICAL OFFICER; P.
EARLY, DEPUTY SUPERINTENDENT OF
SECURITY; S. ROBERTS, DEPUTY
SUPERINTENDENT OF ADMINISTRATION;
KAREN BELLAMY, DIRECTOR OF GRIEVANCE;
MRS. A. SMITH ROBERTS, DEPUTY
SUPERINTENDENT OF PROGRAMS; MRS.
MURRAY, NURSE ADMINISTRATOR; MR. WOLF,
NURSE OF OTISVILLE CORRECTIONAL
FACILITY; MRS. DR. FERDOUS; IMAN
MAMOOD; NURSE ADMINISTRATOR MURRAY
OF OTISVILLE CORRECTIONAL FACILITY;
CHATERIA JACOBEN, SUPERINTENDENT OF
WALLKILL CORRECTIONAL FACILITY;
BRANDON J. SMITH, SUPERINTENDENT OF
GREENE CORRECTIONAL FACILITY; MARIE
HAMMOND, DEPUTY SUPERINTENDENT OF
PROGRAMS; MR. F. STEINBACH, DEPUTY
SUPERINTENDENT OF ADMINISTRATION; D.
SMITH, HEAD DOCTOR OF GREENE
CORRECTIONAL FACILITY; MRS. B. COLE,
NURSE ADMINISTRATOR; MR. MILLER,
DOCTOR OF GREENE/COXSACKIE
CORRECTIONAL FACILITY; MR./MRS. T.
JOHNSON, HEAD ORC OF GREENE
CORRECTIONAL FACILITY; MR./MRS. L.
MARDON, HEAD ORC OF GREENE
CORRECTIONAL FACILITY; MRS. MILES, ORC
OF GREENE CORRECTIONAL FACILITY; MR.
BLACK, IGRC OFFICE SUPERVISOR OF GREENE
CORRECTIONAL FACILITY; MR. MAURO, IGRC
SUPERVISOR II OF GREENE CORRECTIONAL

No. 16-CV-2818 (KMK)

OPINION & ORDER

FACILITY; MRS. D. GLEBOCKI, OF OTISVILLE
CORRECTIONAL FACILITY; HEAD DOCTOR
HERBERT E. GOULDING; SERGEANT ANGELO
ROSADO, JR., OTISVILLE CORRECTIONAL
FACILITY RECEIVING ROOM—NOW A.K.A.
LIEUTENANT ANGELO ROSADO; MARLYN
KOPP, DEPUTY SUPERINTENDENT OF
PROGRAMS; SID JOHNSTON, DEPUTY
SUPERINTENDENT OF ADMINISTRATION;
PATRICIA SUSEN, NURSE OF ADMINISTRATOR;
DR. MARYANN GENOVESE, MEDICAL
DIRECTOR; MRS. APPLE, STEWARD OF GREENE
CORRECTIONAL FACILITY; MR. LOUIS,
PACKAGE ROOM OFFICER; SERGEANT BRANT,
PACKAGE ROOM SERGEANT; CAPTAIN
DOUGLAS, PACKAGE ROOM CAPTAIN; MR. J.
KUSISTO, GRIEVANCE IGRC
SUPERVISOR/OFFICER,

                                                    Defendants.

Appearances:

Dwinel Monroe
New York, NY
*Pro se Plaintiff*

Colleen K. Faherty, Esq.
New York State Office of the Attorney General
New York, NY
*Counsel for Defendants Anthony Annucci, Kathleen Gerbing, Carl Koenigsmann, Peter Early,
Stephen Roberts, Karen Bellamy, Alicia Smith-Roberts, Peter Wolff, Razia Ferdous, Hafiz
Mahmood, Rhonda Murray, Catherine Jacobsen, Brandon Smith, Marie Hammond, Francis
Steinbach, Doreen Smith, Karen Cole, Jon Miller, Tracy Johnson McBride, Lori Mardon, Tracy
Miles, Anthony Black, Thomas Mauro, Danielle Glebocki, Kathy Apple, Sergeant William
Brandt, Captain Douglas, Dr. Maryann Genovese, Dr. Herbert Goulding, Sid Johnston, Marlyn
Kopp, Aaron Lewis, and Patricia Susen*

KENNETH M. KARAS, District Judge:

Dwinel Monroe ("Plaintiff"), proceeding pro se, brings this Second Amended Complaint

("SAC"), pursuant to 42 U.S.C. § 1983, against Anthony Annucci ("Annucci"), Kathleen

Gerbing ("Gerbing"), Carl Koenigsmann ("Koenigsmann"), Peter Early ("Early"), Stephen

Roberts ("Roberts"), Karen Bellamy ("Bellamy"), Alicia Smith-Roberts ("Smith-Roberts"), Peter Wolff ("Wolff"), Razia Ferdous ("Dr. Ferdous"), Hafiz Mahmood ("Mahmood"), Rhonda Murray ("Murray"), Catherine Jacobsen ("Jacobsen"), Brandon Smith ("B. Smith"), Marie Hammond ("Hammond"), Francis Steinbach ("Steinbach"), Doreen Smith ("D. Smith"), Karen Cole ("Cole"), Dr. Jon Miller ("Dr. Miller"), Tracy Johnson McBride ("McBride"), Lori Mardon ("Mardon"), Tracy Miles ("Miles"), Anthony Black ("Black"), Thomas Mauro ("Mauro"), Danielle Glebocki ("Glebocki"), Kathy Apple ("Apple"), Sergeant William Brandt ("Brandt"), Captain Douglas ("Douglas"), Dr. Maryann Genovese ("Dr. Genovese"), Dr. Herbert Goulding ("Dr. Goulding"), Sid Johnston ("Johnston"), Marlyn Kopp ("Kopp"), Aaron Lewis ("Lewis"), and Patricia Susen ("Susen") (collectively, "Defendants"), alleging that Defendants violated his constitutional rights by hindering the free exercise of his religious beliefs, inflicting cruel and unusual punishment with regard to his medical treatment, as well as violating his rights under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act by failing to make necessary accommodations for his medical needs. (*See generally* Second Amended Compl. ("SAC") (Dkt. No. 48).) Before the Court are Defendants' Motions To Dismiss Plaintiff's SAC pursuant to Federal Rule of Civil Procedure 12(b)(6). (*See* Dkt. Nos. 53, 86.)[1] For the following reasons, the Motions are granted in part and denied in part.

---

[1] All Defendants except for Angelo Rosado, Jr. ("Rosado") and J. Kusisto ("Kusisto") have filed Motions. As noted below, Rosado and Kusisto have not been served in this case. Moreover, Kusisto has not been identified as a person who currently is or was employed by the New York State Department of Corrections and Community Supervision ("DOCCS") or the Otisville Correctional Facility ("Otisville"). (*See* New Defs.' Mem. in Supp. of Mot. To Dismiss the SAC ("Second Motion") 1 n.2 (Dkt. No. 87).)

## I.  Background

### A.  Factual Background

The following facts are drawn from Plaintiff's SAC and are taken as true for the purpose of resolving the instant Motions.

#### 1.  Events at Otisville Correctional Facility

Plaintiff is a 54-year old individual who has been imprisoned for at least the last five and a half years.  (*See* SAC ¶ 21.)  Plaintiff purports to be disabled, (*see id.* ¶ 22), as he suffers from heart disease, Chronic Obstructive Pulmonary Disease ("COPD"), "back problems," and "other issues which are well [d]ocumented in his medical chart, (*id.* ¶ 30.)  Plaintiff also suffers from "many other sickness [sic] and illness [sic] that limit his abilities to walk, run, stand, bend and lift." (*Id.* ¶ 31.)  As a result of these ailments, Plaintiff walks with a cane.  (*See id.* ¶ 30.)

On or about June 6, 2015, Plaintiff was transferred from Riverview Correctional Facility to Otisville Correctional Facility ("Otisville").  (*See* SAC ¶ 33.)  Upon his arrival at Otisville, Plaintiff was escorted to the "draft processing room," where Angelo Rosado, Jr. ("Rosado") took Plaintiff's cane while his handcuffs were removed.  (*Id.* ¶ 34.)  Plaintiff requested his cane back once his handcuffs were off, but was told by Rosado that, due to security concerns, Otisville did not allow canes until approved by a nurse and doctor.  (*See id.* ¶ 36.)[2]  On either the same day or shortly thereafter, Plaintiff was called to the medical unit to meet with Wolff, a nurse at Otisville, as well as other medical staff, who took Plaintiff's vital signs and blood pressure, and then gave Plaintiff insulin for his diabetes.  (*See id.* ¶ 41.)  While speaking with Wolff, Plaintiff asked about his cane and informed Wolff that he was experiencing back pain.  (*See id.* ¶ 42.)  Wolff

---

[2] According to Plaintiff, when he challenged Rosado's authority to confiscate his cane and asserted that he had a due process right to use it, Rosado said, "FUCK DUE PROCESS!!!" (SAC ¶ 37.)

unsuccessfully attempted to locate Plaintiff's cane, and informed Plaintiff that security could not find it in the draft processing room. (*See id.* ¶¶ 43–44.) Wolff informed Plaintiff that, until Plaintiff saw a doctor for further evaluation, he would be given a bus pass and bottom bunk pass to alleviate any issues that Plaintiff may have with his back pain. (*See id.* ¶¶ 44–45.) Plaintiff then saw another health care provider at Otisville, Dr. Ferdous, and informed her that his back pain required use of a cane. (*See id.* ¶ 50.) Dr. Ferdous explained that Otisville did not allow canes, but that Plaintiff would be given a one year bus pass for transportation around the facility, as well as permanent assignment to a bottom bunk. (*See id.*)

At an unspecified time, Plaintiff attended the facility orientation at Otisville, where the facility executive team—Gerbing, Early, and Smith-Roberts—informed new inmates of the rules and policies at the facility. (*See id.* ¶¶ 53–54.) During this orientation, Plaintiff spoke with Gerbing, Early, and Smith-Roberts individually regarding his request for a cane, but none of these individuals addressed his request. (*See id.* ¶¶ 55–58.) Plaintiff also made a written request to Smith-Roberts for a "reasonable accommodation" for his back pain, but again received no response. (*Id.* ¶ 62.)

On June 18, 2015, Plaintiff made a request unrelated to his cane and back pain. Plaintiff, a professed Muslim, sought to participate in a fast during the month of Ramadan. (*See id.* ¶ 63.) Plaintiff met with Murray, the Nurse Administrator, and informed her that he intended to fast during Ramadan, which would require changing the time he took his medication and insulin to a time after sundown. (*See id.* ¶ 64.) Murray said a doctor would need to approve this request and thereafter located Dr. Goulding. (*See id.* ¶¶ 65–66.) Plaintiff reiterated his request to Dr. Goulding, who approved the schedule change. (*See id.* ¶¶ 67–68.) Yet, on June 24, 2015, roughly a week into Ramadan, Plaintiff was informed by Wolff that he would no longer be

allowed to take his medicine after sundown, and thus would not be able to complete his fast. (*See id.* ¶¶ 70–71.)  Plaintiff wrote to Murray seeking an explanation, and was told that Wolff had consulted with Mahmood, an Imam that the facility, and decided that Plaintiff—who did not wish to forego his fast—was exempt from fasting under Islamic law due to medical necessity. (*See id.* ¶¶ 74, 79, 87.)

On July 6, 2015, Plaintiff met with Dr. Ferdous and explained this situation.  (*See id.* ¶ 85.)  Dr. Ferdous reinstituted the approval initially granted by Dr. Goulding and allowed Plaintiff to receive his medication after sundown.  (*See id.*  ¶ 86.)  However, two days later, Wolff again informed Plaintiff that he would not be allowed to move the timing of his medication for Ramadan.  (*See id.* ¶ 87.)  Plaintiff then wrote to Dr. Goulding, who responded by rescinding both his prior order and the order of Dr. Ferdous that allowed him to receive his medication after sundown.  (*See id.* ¶ 88.)  Plaintiff was informed that he could either receive his medication at the regular time or he could refuse his medication entirely.  (*See id.*)

After Ramadan, Plaintiff filed requests for "reasonable accommodations" regarding his cane and back pain with Annucci and Koenigsmann, who is the "Chief Doctor of the Department of Corrections," as well as Smith-Roberts, Early, Gerbing, Dr. Goulding, and Glebocki.  (*See id.* ¶¶ 90–91.)  Plaintiff was not granted access to a cane, and was ultimately transferred from Otisville to Wallkill Correctional Facility ("Wallkill") on September 15, 2015.  (*See id.* ¶ 92.)

### 2.  Events at Wallkill Correctional Facility

Plaintiff arrived at Wallkill on September 15, 2015, where he discovered he had been assigned to a room on the third floor.  (*See id.* ¶ 102.)  Plaintiff informed the officer on duty at the "P.C. Room" that he could not walk up to the third floor due to his back pain, as well as other medical conditions, including general difficulty breathing.  (*Id.*)  The officer informed Plaintiff

that he could not do anything at that time, so Plaintiff proceeded to walk up four flights to his new room. (*See id.* ¶¶ 102–104.) Plaintiff quickly realized he could not do this several times each day, so he went to the "clinic" and asked for an "emergency sick call." (*Id.* ¶ 104.) At the clinic, Plaintiff informed Susen, the Nurse Administrator, that his back pain, asthma, and heart disease made it impossible to live on the third floor. (*See id.* ¶¶ 106–08.) Susen said that she had called Dr. Genovese, the Medical Director at Wallkill, and that Plaintiff would be moved to the first floor. (*See id.* ¶ 108.)

The next day, Susen informed Plaintiff that she and Dr. Genovese were worried about Plaintiff carrying "nitro" around the facility and would prefer if he left it in the clinic. (*Id.* ¶ 109.) Plaintiff explained that it was "self carry" and needed to have it on his person in the event of an emergency. (*Id.*) Susen said she would have to speak to Dr. Genevose about this, though she knew that Dr. Genovese did not want him to carry the nitro around the facility. (*See id.* ¶ 110.) Susen went to speak to Dr. Genovese, and upon her return informed Plaintiff that she could not locate Plaintiff's medical chart. (*See id.* ¶ 111.) Dr. Genovese thereafter performed a medical evaluation of Plaintiff and ordered certain medical tests related to his age and stated health conditions. (*See id.* ¶ 112.) Plaintiff asked Dr. Genovese about the use of a cane, as well as "other issues dealing with [his] health" and his medication. (*See id.*) Dr. Genovese informed Plaintiff that he would have to wait until a new medical chart was created, or his old chart was located, so his medical needs could be evaluated. (*See id.*)

Plaintiff immediately filed a request for a "reasonable accommodation" with Deputy Superintendent of Programs Kopp, Deputy Superintendent of Administration Johnston, and Superintendent Jacobsen, seeking the return of his cane and an elevator pass. (*Id.* ¶ 113.) Kopp

informed Plaintiff that Wallkill was a "working facility," that no inmates possessed canes, and the elevator was only used for laundry service. (*See id.* ¶ 114.)

Plaintiff did not receive his cane or an elevator pass prior to his transfer from Wallkill to Greene Correctional Facility ("Greene") on October 1, 2015. (*See id*. ¶ 118.)

### 3. Events at Greene Correctional Facility

Upon his arrival at Greene on October 1, 2015, Plaintiff was brought to the draft room to pick up his property. (*See id.* ¶ 128.) Plaintiff realized that one of his bags was open, (*see id.*), and when he returned to his room he noticed that "22 pouches w[ere] missing," (*id.*). Plaintiff believed that one of the individuals in the draft room stole his property, so he attempted to file a grievance. (*See id.* ¶¶ 129–30.) He was informed by Black, the grievance supervisor at Greene, and Apple, the facility steward, that he could not file a grievance related to lost property and may only "file a claim." (*Id.* ¶ 130.) Plaintiff timely filed this claim, but was not allowed to file a grievance "on due process." (*Id.*) Ultimately, Plaintiff's claim regarding his lost property was denied. (*See id.*) Plaintiff later filed grievances about the theft of his property and lost mail at Greene, specifically against Lewis, Brandt, and Douglas, who Plaintiff claims stole his mail. (*See id.* ¶ 147.)

Plaintiff next filed a grievance requesting access to his cane, but upon being informed that Greene was not a "medical facility" by Deputy Superintendent for Administration Steinbach, Plaintiff proceeded to file a claim for a transfer from Greene. (*See id.* ¶ 135.) Through this grievance process, Plaintiff determined that his medical level had been increased a level between his time at Otisville and Greene. (*See id.* ¶ 136.)

On his first Friday at Greene, Plaintiff asked to speak with the Muslim chaplain, Imam Gaber, about attending "Juma Services." (*Id.* ¶ 137.) However, attending would require Plaintiff

to walk a significant distance that he was physically unable to cover.  (*See id.*)  Plaintiff decided to file a new grievance, this time requesting access to Jumah Services either by way of a bus from his location to the services, or via transfer to Sullivan Correctional Facility.  (*See id.* ¶ 138.) Black informed Plaintiff that he should instead seek a reasonable accommodation, and if not satisfied with that result, refile his grievance.  (*See id.*)  Plaintiff took Black's advice and filed a request for a reasonable accommodation with Deputy Superintendent of Programs Hammond, and sent copes to Steinbach, Superintendent Smith, and Koenigsmann.  (*See id.* ¶ 139.)  After reviewing Plaintiff's request, Hammond informed Plaintiff that she was granting him access to Jumah Services by moving it to the south gym, a mere "10 to 20 yards away from [Plaintiff's] dorm."  (*Id.* ¶ 140.)  Yet, Plaintiff claims that the services were instead held in the "visiting room," which is "50 yards away" and resulted in pain for Plaintiff.  (*Id.* ¶ 182.)  Even still, Plaintiff would not be able to access any activities on the north side of Green, and thus filed another request for a reasonable accommodation on February 2, 2016.  (*See id.* ¶ 144.)  This request went unheeded, so Plaintiff filed a grievance.  (*See id.*)  However, this grievance was determined to be untimely by Mauro.  (*See id.*)

In the meantime, Plaintiff received a cane at Greene from Dr. Miller.  (*See id.* ¶ 153.) However, Plaintiff continued to experience pain in his back and was given new medication that "became addictive" and caused "allergic reactions" when mixed with his existing medication. (*Id.*)

As a result of the conduct taking place at Otisville, Wallkill, and Green, Plaintiff seeks damages for his mental and physical anguish, as well as declaratory relief, to remedy the alleged violation of his First, Eighth, and Fourteenth Amendment rights, as well as violations of the ADA and Rehabilitation Act.

On April 14, 2016, Plaintiff brought suit against Gerbing, Annucci, Koenigsmann, Early, Roberts, Bellamy, Smith-Roberts, Wolff, Dr. Ferdous, Mahmood, Murray, Jacobsen, B. Smith, Hammond, Steinbach, D. Smith, Cole, Dr. Miller, McBride, Mardon, Miles, Black, Mauro, and Glebocki, as well as numerous John Doe defendants.  (*See* Compl. (Dkt. No. 2).  That same day, Plaintiff requested to proceed in forma pauperis ("IFP").  (*See* Request to Proceed IFP (Dkt. No. 1).)  The Court granted Plaintiff's request for IFP status on May 2, 2016.  (Order Granting IFP Application (Dkt. No. 4).)

On September 30, 2016, Plaintiff filed an Amended Complaint, (*See* Am. Compl. (Dkt. No. 42)), but was instructed by the Court to file a Second Amended Complaint to address certain deficiencies in his pleadings, (*See* Order (Dkt. No. 44).)  Plaintiff thereafter filed his Second Amended Complaint on October 26, 2016, where he added claims against Rosado, Kusisto, Kopp, Johnston, Susen, Dr. Genovese, Apple, Lewis, Brandt, Douglas, and Dr. Goulding.  (*See* SAC.)  Plaintiff's IFP status entitled him to service upon the newly named defendants in the SAC, which was delayed through no fault of his own and commenced by way of an Order of Service issued by the Court on March 27, 2017.  (Order of Service 2–3 (Dkt. No. 56).)  Plaintiff also filed an Application To Request Appointment of Counsel on March 24, 2017, (*see* Dkt. No. 59), which the Court denied without prejudice on October 4, 2017, (*see* Order (Dkt. No. 90)).

While the process of serving those newly added individuals was ongoing, Defendants Gerbing, Annucci, Koenigsmann, Early, Roberts, Bellamy, Smith-Roberts, Wolff, Dr. Ferdous, Mahmood, Murray, Jacobsen, B. Smith, Hammond, Steinbach, D. Smith, Cole, Dr. Miller, McBride, Mardon, Miles, Black, Mauro, and Glebocki moved to dismiss the SAC.  (*See* Initial Defs.' Mot. To Dismiss the SAC ("First Motion") (Dkt. No. 53).)  On August 3, 2017, after

service upon the new defendants was executed, Defendants Apple, Brandt, Douglas, Dr. Genovese, Dr. Goulding, Johnston, Kopp, Lewis, and Susen moved to dismiss Plaintiff's claims, and joined in the initial Motion as well. (*See* New Defs.' Mot. To Dismiss the SAC ("August 3 Defs.' Mot.") (Dkt. No. 86).) Rosado and Kusisto remained unserved however, and have not joined in either Motion To Dismiss. (*See* New Defs.' Mem. in Supp. of Mot. To Dismiss the SAC ("Second Motion") 1 n.2 (Dkt. No. 87).) The August 3 Motion also served to inform the Court that Dr. Goulding had passed away and his estate was handled by Maxine Goulding, the representative of Dr. Goulding's estate, whom the Attorney General's office also represented. (*See id.* at 1 n.1.)

Plaintiff did not respond to either of the Motions. The Court will therefore consider the Motions fully briefed, but independently consider the merits of the Motions. *See Goldberg v. Danaher,* 599 F.3d 181, 183 (2d Cir. 2010) (explaining that district courts should consider the merits of a motion to dismiss rather than automatically grant the motion if a plaintiff fails to respond).

## II. Discussion

### A. Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and internal quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked

assertions devoid of further factual enhancement." *Id.* (alteration and internal quotation marks

omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief

above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated

adequately, it may be supported by showing any set of facts consistent with the allegations in the

complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that

is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his] claim[] across the line from

conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679

("Determining whether a complaint states a plausible claim for relief will . . . be a context-

specific task that requires the reviewing court to draw on its judicial experience and common

sense. But where the well-pleaded facts do not permit the court to infer more than the mere

possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader

is entitled to relief.'" (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P.

8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hyper-

technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a

plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the

factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per

curiam), and "draw[] all reasonable inferences in favor of the plaintiff," *Daniel v. T&M Prot.*

*Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*,

699 F.3d 141, 145 (2d Cir. 2012)). Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a

district court must confine its consideration to facts stated on the face of the complaint, in

documents appended to the complaint or incorporated in the complaint by reference, and to

matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d

99, 107 (2d Cir. 1999) (internal quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

Where, as here, a plaintiff proceeds pro se, the court must "construe[] [his] [complaint] liberally and interpret[] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (internal quotation marks omitted). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (internal quotation marks omitted); *see also Caidor v. Onondaga Cty.*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics and internal quotation marks omitted)).

### B. Analysis

#### 1. Eighth Amendment

Plaintiff's SAC alleges that Defendants were "deliberate[ly] indifferent" in that the "medical treatment [was] below standard and close to gross negligence." (SAC ¶ 25.) "The Eighth Amendment forbids 'deliberate indifference to serious medical needs of prisoners.'" *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). A convicted prisoner's claim of deliberate indifference to his medical needs by those overseeing his care is analyzed under the Eighth Amendment because it is an allegation that "conditions of confinement [are] a form of punishment" and thus is a "violation of [the] Eighth Amendment right to be free from cruel and unusual punishments." *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017). Here, too, the inquiry proceeds by two steps, "[f]irst, the plaintiff must establish that he suffered a sufficiently serious constitutional deprivation. Second, the plaintiff must demonstrate that the defendant acted with deliberate

indifference." *Feliciano v. Anderson*, No. 15-CV-4106, 2017 WL 1189747, at *8 (S.D.N.Y. Mar. 30, 2017).

"The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious." *Spavone*, 719 F.3d at 138 (internal quotation marks omitted). Analyzing this objective requirement involves two inquiries: "[t]he first inquiry is whether the prisoner was actually deprived of adequate medical care," *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006), and the second "asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the [C]ourt to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner," *id.* at 280. To meet the objective requirement, "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013). "There is no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition." *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003). Nevertheless, the Second Circuit has presented the following non-exhaustive list of factors to consider when evaluating an inmate's medical condition: "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.'" *Id.* (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

"The second requirement is subjective: the charged officials must be subjectively reckless in their denial of medical care." *Spavone*, 719 F.3d at 138. Under the second prong, the defendant must "appreciate the risk to which a prisoner was subjected," and had a "subjective awareness of the harmfulness associated with those conditions to be liable for meting out that

punishment." *Darnell*, 849 F.3d at 35. In other words, "[i]n medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Nielsen v. Rabin*, 746 F.3d 58, 63 (2d Cir. 2014) (internal quotation marks omitted). "Deliberate indifference is a mental state equivalent to subjective recklessness," and it "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* (internal quotation marks omitted). "[M]ere negligence" is not enough to state a claim for deliberate indifference. *Walker*, 717 F.3d at 125 (internal quotation marks omitted); *see also Vail v. City of New York*, 68 F. Supp. 3d 412, 424 (S.D.N.Y. 2014). Relatedly, "mere disagreement over the proper treatment does not create a constitutional claim," and accordingly, "[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance*, 143 F.3d at 703.

Plaintiff alleges that he suffers from back pain and heart disease, which required use of a cane at Otisville, Wallkill, and Greene, as well as use of nitro to treat his heart disease. (*See* SAC ¶ 30–32.) He also claims to suffer from diabetes and requires insulin to be given on a daily basis, (*see id*. ¶ 41.) Plaintiff further alleges that, at Greene, Dr. Miller provided him with new medication that "became addictive" and caused "allergic reactions" when mixed with his existing medication, so he had to "get off" the new medicine. (*Id.* ¶ 153.) These allegations are insufficient to state a deliberate indifference claim against any Defendant. Assuming here that Plaintiff's allegations of chronic back pain, heart problems, and other maladies constituted sufficiently serious medical conditions, Plaintiff's medical needs were not ignored. Upon his arrival at Otisville, though Plaintiff's cane was taken from him, he was able to meet with Dr.

Ferdous and Nurse Wolff, who Plaintiff claims provided him with a one-year bus pass for transportation around the facility, as well as permanent assignment to a bottom bunk, to alleviate any issues that may arise due to back pain and his heart condition.[3] (*See* SAC ¶ 50.) Plaintiff also received his insulin from Dr. Goulding, and plaintiff does not allege that he was deprived of his medication, but simply that he wished to take it at a different time due to his religious beliefs. (*See id.* ¶¶ 71–72.) The same is true at Wallkill, where Plaintiff immediately went to the medical staff and asked for an "emergency sick call." (*Id.* ¶ 104.) Upon learning from Plaintiff that his back pain, heart disease, and other medical issues made it impossible to live on the third floor, Nurse Administrator Susen and Dr. Genovese immediately reassigned plaintiff to the first floor. (*See id.* ¶¶ 106–08.) Dr. Genovese thereafter performed a full medical evaluation of Plaintiff and ordered certain medical tests related to his age and stated health conditions. (*See id.* ¶ 112.) Finally, at Greene, Plaintiff received his sought-after cane from Dr. Miller, as well as new medication to alleviate his ongoing back pain. (*See id.* ¶ 153.) Though Plaintiff claims to have suffered an adverse reaction to the medication, he does not give any details about this adverse reaction to qualify it as a serious medical issue. (*See id.*)

Plaintiff's claims under the Eight Amendment amount to nothing more than a dispute with the medical staff at Otisville, Wallkill, and Greene over the treatment he has received. Yet, such disagreement regarding the particularities of his treatment is insufficient to state a claim. *See Chance,* 143 F.3d at 703 ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim."); *Nelson v. Deming,* 140 F. Supp. 3d 248, 262 (W.D.N.Y. 2015) (dismissing deliberate indifference claim because the "[p]laintiff's

---

[3] Moreover, Plaintiff was told by Rosado and Dr. Ferdous that his cane was only being withheld due to security concerns, rather than to deprive Plaintiff of his medical care, as Otisville does not permit canes. (*See* SAC ¶¶ 36, 50.)

disagreement with th[e] course of treatment does not amount to deliberate indifference by [the] [d]efendants"); *Washington v. Westchester Cty. Dep't of Corr.,* No. 13-CV-5322, 2014 WL 1778410, at *6 (S.D.N.Y. Apr. 25, 2014) ("[I]t is well-settled that the ultimate decision of whether or not to administer a treatment or medication is a medical judgment that, without more, does not amount to deliberate indifference."); *Idowu v. Middleton,* No. 12-CV-1238, 2013 WL 4780042, at *9 (S.D.N.Y. Aug. 5, 2013) ("[The] [p]laintiff's disagreement with [a defendant]'s diagnostic technique and medical judgment cannot provide the basis for a deliberate indifference claim under the Eighth Amendment."); *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001) ("[D]isagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a [§] 1983 claim.  These issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment.").

Regarding the subjective prong, Plaintiff offers conclusory allegations that Defendants were deliberately indifferent to his medical needs, but has not alleged sufficient facts to support this allegation.  In fact, Plaintiff's SAC makes clear that Defendants at each of the three facilities attempted to provide Plaintiff with care that Defendants believed was sufficient to address Plaintiff's medical needs.  *See Flemming v. Smith,* No. 11-CV-804, 2014 WL 3698004, at *6 (N.D.N.Y. July 24, 2014) ("Conclusory allegations that medical staff defendants were aware of a [prisoner's] medical needs and failed to provide adequate care are generally insufficient to state an Eighth Amendment claim of inadequate medical care."); *Gumbs v. Dynan,* No. 11-CV-857, 2012 WL 3705009, at *12 (E.D.N.Y. Aug. 26, 2012) ("[C]onclusory allegations that [the] defendants were aware of [the] plaintiff's medical needs and chronic pain but failed to respond

are generally not sufficient proof of [the] defendants' deliberate indifference and cannot survive a Rule 12(b)(6) motion to dismiss."); *Adekoya v. Holder,* 751 F. Supp. 2d 688, 697 (S.D.N.Y. 2010) (finding conclusory allegations that the defendants were aware of the plaintiff's medical needs and failed to provide adequate care insufficient to defeat a motion to dismiss); *Evans v. Albany Cty. Corr. Facility,* No. 05-CV-1400, 2009 WL 1401645, at *9 (N.D.N.Y. May 14, 2009) (noting that "a showing of deliberate indifference requires more than just vague and conclusory allegations" (internal quotation marks omitted)). Plaintiff's allegations suggest that he received all medical consultations that were requested, and the mere fact that he disagrees with the chosen methods of treatment is insufficient to support his Eighth Amendment deliberate indifference claim. Therefore, this claim is dismissed as to all movants.

### 2. First Amendment

#### a. Retaliation

Plaintiff cursorily alleges that he was transferred from Otisville to Wallkill to Greene due to his filing of grievances and his frequent requests for reasonable accommodations. (*See* SAC ¶¶ 92, 124.) A plaintiff asserting a First Amendment retaliation claim must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Espinal v. Goord,* 558 F.3d 119, 128 (2d Cir. 2009) (internal quotation marks omitted). Courts are instructed to "approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official . . . can be characterized as a constitutionally proscribed retaliatory act." *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir. 2003) (internal quotation marks omitted). Accordingly, First Amendment retaliation claims brought by prisoners must "be 'supported by specific and detailed factual allegations,' not stated 'in wholly conclusory terms.'" *Dolan v. Connolly,* 794 F.3d 290, 295 (2d Cir. 2015)

(quoting *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir. 1983), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002)).

Plaintiff's filing of grievances is protected conduct and therefore meets the first prong of the inquiry. *See Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir. 1996) ("This court has held that retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983."); *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir. 1988) ("[I]ntentional obstruction of a prisoner's right to seek redress of grievances is precisely the sort of oppression that [§] 1983 is intended to remedy." (internal quotation marks and alterations omitted)). However, assuming, *arguendo,* that Plaintiff's transfer is an "adverse action" that meets the second prong, he has not alleged sufficient facts showing "a causal connection between the protected speech and the adverse action." *Espinal,* 558 F.3d at 128 (internal quotation marks omitted).

A plaintiff cannot sustain a claim of retaliation without proving that the defendant knew of the protected conduct—in this case, the grievances filed—or participated in the alleged retaliatory act. *See Wright v. Goord,* 554 F.3d 255, 274 (2d Cir. 2009) (dismissing retaliation claim where "the only individual defendants named in the . . . [c]omplaint were [supervisors], none of whom was alleged to have participated in th[e] [retaliatory] event"); *Tirado v. Shutt*, No. 13-CV-2848, 2015 WL 774982, at *10 (S.D.N.Y. Feb. 23, 2015) ("Absent evidence that any defendant knew about his . . . grievance, [the plaintiff] has failed to provide any basis to believe that they retaliated against him for a grievance in which they were not named."), *adopted in relevant part by* 2015 WL 4476027 (S.D.N.Y. Jul. 22, 2015); *Wesley v. Kalos,* No. 97-CV-1598, 1997 WL 767557, at *5 (S.D.N.Y. Dec. 11, 1997) ("To establish a claim of retaliatory transfer

requires [the plaintiff], at a minimum, to assert facts to show that the [d]efendants knew of [the plaintiff's] complaints prior to the transfer.").  Given that Plaintiff merely alleges that the decision to transfer him, from Otisville to Wallkill or from Wallkill to Greene, was made as a result of grievances he filed, Plaintiff has failed to establish the personal involvement of any Defendants.  To the extent that he alleges that Gerbing and Jacobsen, as Superintendents of Otisville and Wallkill, respectively, were personally involved in his transfer due to his filing of grievances at their facilities, such a claim would still fail to establish personal involvement.  "It is well settled that mere receipt of a grievance or misbehavior report does not establish liability under § 1983." *Lebron v. Mrzyglod*, No. 14-CV-10290, 2017 WL 365493, at *6 (S.D.N.Y. Jan. 24, 2017); *see also Whitenack v. Armor Med.*, No. 13-CV-2071, 2014 WL 5502300, at *6 (E.D.N.Y. Oct. 30, 2014) ("Since [the] plaintiff has pled no facts, beyond [the sheriff's] presumed receipt of grievances and his position atop the [correctional center] . . . , [the plaintiff] has failed to plausibly plead [the sheriff's] personal involvement in any infringement of [the plaintiff's] constitutional rights." (alterations and internal quotation marks omitted)).  Absent some allegation explaining Gerbing's, Jacobsen's, or any Defendant's direct, indirect, or supervisory involvement in the transfer decisions, Plaintiff has failed to establish a plausible causal connection between the filing of his grievances and the allegedly retaliatory actions taken here, and thus fails to state a claim for retaliatory action in violation of his First Amendment rights.  *See Mateo v. Dawn*, No. 14-CV-2620, 2016 WL 5478431, at *8 (S.D.N.Y. Sept. 28, 2016) (holding a plaintiff's failure to allege any knowledge of the protected conduct, or involvement in the retaliatory action, results in a "fail[ure] to establish a plausible causal connection" for the purposes of a retaliation claim).

<u>b. Free Exercise Clause</u>

The Court construes Plaintiff's SAC as asserting a claim under the First Amendment due to the decision of Dr. Goulding, Wolff, Murray, and Mahmood to require delivery of Plaintiff's medication during the fasting hours of Ramadan. (*See* SAC ¶ 70–74, 87–88, 174.) "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause," *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003), which includes the right to participate in religious services, *see Salahuddin v. Coughlin*, 993 F.2d 306, 308 (2d Cir. 1993). A prisoner's First Amendment rights, however, are "[b]alanced against . . . the interests of prison officials charged with complex duties arising from administration of the penal system." *Ford*, 352 F.3d at 588 (internal quotation marks omitted); *see also Weathers v. Rock*, No. 12-CV-1301, 2014 WL 4810309, at *4 (N.D.N.Y. Sept. 23, 2014) (explaining that the right of inmates to freely exercise a chosen religion "is not limitless, and may be subject to restrictions relating to legitimate penological concerns"). Accordingly, a prisoner's free exercise claims are "judged under a reasonableness test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *Ford*, 352 F.3d at 588 (internal quotation marks omitted).

"To be entitled to protection under the free exercise clause of the First Amendment, a prisoner must make a threshold showing that the disputed conduct substantially burdened his sincerely held religious beliefs." *Washington v. Chaboty*, No. 09-CV-9199, 2015 WL 1439348, at *9 (S.D.N.Y. March 30, 2015) (alteration and internal quotation marks omitted); *see also Salahuddin v. Goord*, 467 F.3d 263, 274–75 (2d Cir. 2006) ("The prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs."); *Shapiro v. Cmty. First Servs., Inc.*, No. 11-CV-4061, 2014 WL 1276479, at *10 (E.D.N.Y. Mar.

27, 2014) ("At the motion to dismiss stage, a complaint must assert sufficient allegations necessary to establish that [the] plaintiff's claim is based upon a sincerely held religious belief." (alteration and internal quotation marks omitted)).[4]  In determining whether a belief is "sincere," "an individual . . . need only demonstrate that the beliefs professed are sincerely held and in the individual's own scheme of things, religious." *Ford*, 352 F.3d at 588 (alteration and internal quotation marks omitted).  Moreover, "[a] substantial burden on religious exercise exists where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Rossi v. Fishcer*, No. 13-CV-3167, 2015 WL 769551, at *7 (S.D.N.Y. Feb. 24, 2015) (internal quotation marks omitted).  The Second Circuit has further specified that "[t]he relevant question in determining whether [the plaintiff's] religious beliefs were substantially burdened is whether participation in the [religious activity], in particular, is considered central or important to [the plaintiff's religious] practice." *Ford*, 352 F.3d at 593–94.  "Once [a] plaintiff establishes this burden, '[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct.'" *Smith v. Perlman*, No. 11-CV-20, 2012 WL 929848, at *7 (N.D.N.Y. Mar. 19, 2012) (quoting *Salahuddin*, 467 F.3d at 308).  The burden then shifts to the inmate "to show that these articulated concerns were irrational." *Salahuddin*, 467 F.3d at 275 (alteration and internal quotation marks omitted).

---

[4] The Second Circuit has explained that "[i]t has not been decided in this Circuit whether, to state a claim under the First Amendment's Free Exercise Clause, a prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Holland v. Goord*, 758 F.3d 215, 220 (2d Cir. 2014).  The Second Circuit has chosen to not confront this question—or at the very least, to not alter the previous assumption that the substantial burden test is a threshold question.  *Id.* at 221.  Accordingly, this Court "will follow the analysis in *Holland* and proceed to consider the First Amendment analysis, assuming that the substantial burden test is still valid."  *Weathers*, 2014 WL 4810309, at *4; *see also Gilliam v. Baez*, No. 15-CV-6631, 2017 WL 476733, at *4 n.5 (S.D.N.Y. Feb. 2, 2017) (same).

Defendants do not contest the sincerity of Plaintiff's religious beliefs. The Court, therefore, will assume for the purpose of resolving the instant Motions that Plaintiff's religious beliefs are sincerely held.

The Court turns, then, to whether Plaintiff has adequately alleged that his ability to exercise his religious beliefs was substantially burdened. The Second Circuit has long held "that prison authorities must accommodate the right of prisoners to receive diets consistent with their religious scruples." *Kahane v. Carlson,* 527 F.2d 492, 495 (2d Cir. 1975); *see also McEachin v. McGuinnis,* 357 F.3d 197, 203 (2d Cir. 2004) (explaining that to "deny prison inmates the provision of food that satisfies the dictates of their faith . . . unconstitutionally burden[s] their free exercise rights"); *Ford,* 352 F.3d at 597 ("We . . . have clearly established that a prisoner has a right to a diet consistent with his or her religious scruples . . . ."); *accord Crichlow v. Fischer*, No. 12-CV-7774, 2015 WL 678725, at *3 (S.D.N.Y. Feb. 17, 2015) ("Generally, an inmate is entitled to a reasonable accommodation of his religious beliefs, including religious dietary beliefs.").

Plaintiff alleges that he is Muslim and that taking his medication, including his insulin, prior to sundown violated his religious beliefs, as he was required to fast during the month of Ramadan. (*See* SAC ¶¶ 71, 73, 80–82.) "[A] substantial burden exists where the state 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) (alteration in original) (quoting *Thomas v. Review Bd. of the Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981)); *see also Holland*, 758 F.3d at 221 (noting that "a Muslim inmate's free exercise rights would be substantially burdened if prison officials denied his request for a meal to celebrate the [end of Ramadan] feast"). Here, Plaintiff has plausibly alleged that his sincerely held religious beliefs were substantially burdened, as he

claims he was forced to choose between taking his prescribed medication and complying with his religious fasting requirements. *See Torres v. Aramark Food*, No. 14-CV-7498, 2015 WL 9077472, at *9 (S.D.N.Y. Dec. 16, 2015) (finding religious beliefs substantially burdened when the plaintiff was "forced to choose between eating nutritionally adequate meals and complying with his religious fasting requirements"); *Houston v. Schriro*, No. 11-CV-7374, 2013 WL 4457375, at *8 (S.D.N.Y. Aug. 20, 2013) ("[F]orcing Plaintiff to choose between his religion and his health imposed a substantial burden on the exercise of his religious beliefs."); *Abdul-Mateen v. Phipps*, No. 11-CV-0051, 2012 WL 601430, at * 4–5 (W.D. Va. Feb. 23, 2012) (holding that refusing to alter medication schedules to accommodate the fasting requirements of Ramadan qualifies as a substantial burden upon a plaintiff's religious beliefs).

Because Plaintiff has crossed the substantial burden threshold, Defendants now must meet "the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct." *Salahuddin*, 467 F.3d at 275. To make this determination, a court must consider:

> whether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating the right; and the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests.

*Holland*, 758 F.3d at 222–23 (quoting *Salahuddin*, 467 F.3d at 274). Additionally, the rule requiring a legitimate penological interest is equally applicable to individual actions of prison personnel as it is to generally-applied policies or regulations. *See Salahuddin*, 467 F.3d at 274 n.4 ("An individualized decision to deny a prisoner the ability to engage in religious exercise is analyzed in the same way as a prison regulation denying such exercise.").

Wolff, Murray, and Dr. Goulding assert that, in consultation with Imam Mahmood regarding Islamic law, that they had a legitimate interest in "ensuring the health and wellbeing of [Plaintiff]." (First Motion 13; Second Motion 9.) Here, Defendants do not contest that Plaintiff had no other means of participating in his Ramadan fast other than an alteration to his medication schedule. *Omaro v. O'Connell*, No. 14-CV-6209, 2016 WL 8668508, at *7 (W.D.N.Y. Nov. 4, 2016) ("[B]ecause the prison controlled [the plaintiff's] meals, he had no 'alternative means' of exercising his right to Ramadan fasting and the specially-timed meals associated with that observance.") Nor do Defendants argue that the change in Plaintiff's medication schedule would have any impact on the allocation of prison resources. Nor could they, as the impact of allowing Plaintiff to continue to receive his medication in compliance with his Ramadan fast would have been minimal, because he was already receiving that accommodation. *See id.* ("[T]he impact of allowing [the plaintiff] to stay on the Ramadan callout list would have been minimal, because he was *already on it.*"); *see also Muhammad v. San Joaquin Cty. Jail*, No. 02-CV-0006, 2006 WL 1282944, at *7 (E.D. Cal. May 10, 2006), *adopted by*, 2006 WL 2082249 (E.D. Cal. July 25, 2006) (holding that "no legitimate penological interest [had] been advanced which would justify the refusal to provide bag meals to eat after sundown during Ramadan to Muslim prisoners who request them" because such meals were already being provided).

Nor can Defendants establish that no alternative means existed to facilitate Plaintiff's right. Plaintiff alleges that he was given his medication after his fast for five days without incident or illness, which belies Defendants' assertion that concern for Plaintiff's health and well-being drove this decision. (*See* SAC ¶¶ 69–70.) Defendants do not argue that there was a change in Plaintiff's condition that would prompt Defendants to rescind their permission for Ramadan-compliant medication; in fact, Plaintiff alleged Dr. Ferdous reinstated his preferred

medication schedule on July 6, 2015, until Wolff again rescinded this order.  (*See id.* ¶¶ 85–87.)

Without any change in circumstances, Defendants need not discontinue the medication schedule

put into place at the start of Ramadan.  *See Turner v. Safley*, 482 U.S. 78, 91 (1987) ("[I]f an

inmate claimant can point to an alternative that fully accommodates the prisoner's rights at de

minimis cost to valid penological interests, a court may consider that as evidence that the

regulation does not satisfy the reasonable relationship standard.")

Thus, at this stage, Defendants have failed to identify a legitimate penological interest

that would satisfy the requirements of the Free Exercise Clause.  *See, e.g., Washington v.

Chaboty,* No. 09-CV-9199, 2011 WL 102714, at *10 (S.D.N.Y. Jan. 10, 2011) ("The Second

Circuit has cautioned that evaluation of penological interests is a fact-intensive inquiry that is not

ordinarily amenable to resolution on a motion to dismiss." (citing *Shakur v. Selsky,* 391 F.3d 106,

115 (2d Cir. 2004)), *rev'd in part on other grounds sub nom Washington v. Gonyea*, 538 F.

App'x 23 (2d Cir. 2013).  Therefore, this claim survives the Motions To Dismiss.

### c.  Qualified Immunity

Dr. Goulding, Wolff, Murray, and Mahmood next contend that they are entitled to

qualified immunity in the event Plaintiff's First Amendment claims survive.  "The doctrine of

qualified immunity protects government officials from liability for civil damages insofar as their

conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal

quotation marks omitted).  Qualified immunity "'gives government officials breathing room to

make reasonable but mistaken judgments' by 'protect[ing] all but the plainly incompetent or

those who knowingly violate the law.'" *City and County of San Francisco v. Sheehan*, 135 S. Ct.

1765, 1774 (2015) (alteration in original) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743

(2011)).  Because qualified immunity is "an affirmative defense [that] . . . reflects an immunity from suit rather than a mere defense to liability[,] . . . it is appropriate to decide the issue of qualified immunity, when raised, at an early stage of the litigation, such as when deciding a pre-answer motion to dismiss." *Betts v. Shearman*, No. 12-CV-3195, 2013 WL 311124, at *4 (S.D.N.Y. Jan. 24, 2013) (italics, citations, and internal quotation marks omitted), *aff'd*, 751 F.3d 78 (2d Cir. 2014).

In determining whether a right is clearly established, the "inquiry turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Pearson*, 555 U.S. at 244 (internal quotation marks omitted).  "In the Second Circuit, 'a right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful.'" *Schubert v. City of Rye*, 775 F. Supp. 2d 689, 702 (S.D.N.Y. 2011) (quoting *Luna v. Pico*, 356 F.3d 481, 490 (2d Cir. 2004)).

A Muslim inmate's right to participate in Ramadan fasting was clearly established at the time of the incident.  *See Ford*, 352 F.3d at 597 (holding that it a Muslim inmate's "right to a diet consistent with his or her religious scruples" is clearly established); *Bass v. Coughlin*, 976 F.2d 98, 99 (2d Cir. 1992) (per curiam) ("At least as early as 1975, it was established that prison officials must provide a prisoner a diet that is consistent with his religious scruples."). Defendants are correct that the Second Circuit has never specifically recognized that facility personnel are required to change an inmate's medication schedule to accommodate their Ramadan fast, (*see* First Motion 14; Second Motion 9), "but courts need not have ruled in favor of a prisoner under precisely the same factual circumstance in order for the right to be clearly

established," *Ford*, 352 F.3d at 597; *see also Ganek v. Leibowitz*, 874 F.3d 73, 81 (2d Cir. 2017) ("To make this 'clearly established' showing, a plaintiff need not identify a case directly on point, but precedent must have spoken with sufficient clarity to have placed the constitutional question 'beyond debate.'" (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Moreover, Defendants cannot simply rely upon the opinion of Mahmood that Plaintiff may break his fast if his physicians determine there is a medical necessity. *See id.* at 598 ("[R]eligious authorities' opinions that a particular practice is not religiously mandated under Muslim law, without more, cannot render defendants' conduct reasonable."); *Jackson v. Mann,* 196 F.3d 316, 321 (2d Cir. 1999) (denying qualified immunity to prison officials who refused prisoner a kosher diet in reliance upon prison rabbi's advice that prisoner was not a Jew under Jewish law). Defendants have not otherwise established at this stage that their conduct was "objectively reasonable" in light of clear Second Circuit precedent, and therefore this claim will not be dismissed on qualified immunity grounds at this time.

### 3. Fourteenth Amendment

Plaintiff contends that his rights under the Due Process Clause of the Fourteenth Amendment were violated by Defendants Apple, Brandt, Douglas, and Lewis based on the alleged theft of his property at Greene. (*See* SAC ¶ 188.) "Section 1983 provides a cause of action against any person who deprives an individual of federally guaranteed rights 'under color' of state law." *Filarsky v. Delia*, 566 U.S. 377, 383 (2012). The statute itself "creates no substantive rights," but merely provides a procedure for redress for the "deprivation[ ] of rights established elsewhere." *City of Okla. City v. Tuttle*, 471 U.S. 808, 816 (1985); *see also Louis v. Metro. Transit Auth.*, 145 F. Supp. 3d 215, 223 (E.D.N.Y. 2015) (same). Thus, to state a claim pursuant to § 1983, a plaintiff must allege (1) that the challenged conduct was "committed by a

person acting under color of state law," and (2) that such conduct "deprived [the plaintiff] of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010) (internal quotation marks omitted).

Pursuant to the Due Process Clause of the Fourteenth Amendment, "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV; *see also Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (holding that a procedural due process violation arises under the Fourteenth Amendment when a plaintiff has been deprived of a constitutionally protected interest in life, liberty, or property without due process of law). The Due Process Clause protects "the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974); *see also Zherka v. Ryan*, 52 F. Supp. 3d 571, 582 (S.D.N.Y. 2014) (same). To state a procedural due process claim, a plaintiff "must first establish that he enjoyed a protected . . . interest." *Arce v. Walker*, 139 F.3d 329, 333 (2d Cir. 1998). If a plaintiff establishes such a protected interest, the next question is whether "the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011).

As an initial matter, "an unauthorized intentional deprivation of property by a state employee does not constitute a violation of . . . the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." *Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *see also Acevedo v. Fischer*, No. 12–CV–6866, 2014 WL 5015470, at *13 (S.D.N.Y. Sept. 29, 2014) (same).[5] In fact, "the state's action is not complete until and unless it provides or refuses

---

[5] The Second Circuit has explained that "[w]hen the state conduct in question is random and unauthorized, the state satisfies procedural due process requirements so long as it provides meaningful post-deprivation remedy." *Rivera–Powell v. N.Y.C. Bd. of Elections*, 470 F.3d 458, 465 (2d Cir. 2006). However, "when the deprivation is pursuant to an established state procedure, the state can predict when it will occur and is in the position to provide a pre-

to provide a suitable postdeprivation remedy." *Acevedo*, 2014 WL 5015470, at *13 (quoting *Hudson*, 468 U.S. at 533.) Applying this doctrine, "the Second Circuit has determined that 'New York in fact affords an adequate post-deprivation remedy in the form of, inter alia, a Court of Claims action.'" *Id.* (quoting *Jackson v. Burke*, 256 F.3d 93, 96 (2d Cir. 2001)); *see also Malik v. City of New York*, No. 11–CV–6062, 2012 WL 3345317, at *11 (S.D.N.Y. Aug. 15, 2012) ("New York provides such an adequate post-deprivation remedy in the form of state law causes of action for negligence, replevin, and conversion."), *adopted by* 2012 WL 4475156 (S.D.N.Y. Sept. 28, 2012). District courts thus routinely dismiss claims by inmates who assert that they were deprived of property by corrections officers. *See, e.g., West v. City of New York*, No. 13-CV-5155, 2014 WL 4290813, at *6 (S.D.N.Y. Aug. 28, 2014) (holding "the deprivation of [the inmate's] property interest in his mail is not a cognizable constitutional injury" given the availability of "adequate state post-deprivation remedies" under New York law (internal quotation marks omitted)); *JCG v. Ercole*, No. 11–CV–6844, 2014 WL 1630815, at *32 (S.D.N.Y. Apr. 24, 2014) (dismissing an inmate's deprivation of property claim because "the existence of an adequate post-deprivation state remedy precludes a due process claim under § 1983"), *adopted by* 2014 WL 2769120 (S.D.N.Y. June 18, 2014); *Green v. Niles*, No. 11–CV–1349, 2012 WL 987473, at *6 (S.D.N.Y. Mar. 23, 2012) (dismissing an inmate's claim because "a prison's loss of an inmate'[s] property . . . will not support a due process claim redressable under § 1983 if adequate state post-deprivation remedies are available" (internal quotation marks omitted)).

---

deprivation hearing ... [such that] the availability of post-deprivation procedures will not, ipso facto, satisfy due process." *Id.* (italics, citation, and internal quotation marks omitted).

Here, the SAC includes only the bare allegation that Defendants Apple, Brandt, Douglas, and Lewis are "stealing Plaintiff's packages," (SAC ¶ 146), and that Plaintiff has grieved this issue, (*see id.* ¶ 147.)  While Plaintiff alleges that he is "not the only one it is happening too [sic]," (*id.* ¶ 148), he provides no details as to that claim to indicate a facility-wide practice beyond this conclusory allegation.  This is insufficient to state a claim.  *See Johnston v. Town of Orangetown*, No. 10-CV-8763, 2013 WL 1189483, at *7 (S.D.N.Y. Mar. 22, 2013), *aff'd*, 562 F. App'x 39 (2d Cir. 2014) (finding no established state procedure when the only allegation was the plaintiff's "conclusory assertion" that the constitutional deprivation was "the product of a long-established municipal policy, practice, and/or custom" to deprive the Plaintiff of due process); *Richardson v. Coughlin*, 101 F. Supp. 2d 127, 133 (W.D.N.Y. 2000) (holding there is no established state procedure when the allegations are "grounded only in conclusory statements supported by scant evidence");  Therefore, because the deprivation of property was "effected through random and unauthorized conduct of a state employee"—as opposed to "established state procedure"—Plaintiff has an adequate post-deprivation remedy under state tort law. *Hudson*, 468 U.S. at 532–33.  Consequently, he cannot sustain a § 1983 claim based on the deprivation of his personal property.  *See Franco*, 854 F.2d at 588 (noting that the "mere deprivation of personal property would not rise to the level of a constitutional injury").

Moreover, Plaintiff's claim that Defendants Mauro, Black, and Bellamy have violated his right to due process by failing to timely respond to his grievances also fails to state a claim.  "[I]t is well-established that inmates do not have a protected liberty interest in the processing of their prison grievances." *Crichlow v. Fischer*, No. 15-CV-6252, 2017 WL 920753, at *7 (W.D.N.Y. Mar. 7, 2017); *see also Corley v. City of New York*, No. 14-CV-3202, 2017 WL 4357662, at *7 (S.D.N.Y. Sept. 28, 2017) ("[The p]laintiff did not have a liberty interest to access the [prison]

grievance program that would provide a basis for a constitutional due process claim here.");
*Njasang Nji v. Heath*, No. 13-CV-200, 2013 WL 6250298, at *6 (S.D.N.Y. Dec. 2, 2013)
("[I]nmate grievance programs created by state law are not required by the Constitution and
consequently allegations that prison officials violated those procedures does not give rise to a
cognizable § 1983 claim." (internal quotation marks omitted)); *Mimms v. Carr*, No. 09-CV-5740,
2011 WL 2360059, at *10 (E.D.N.Y. June 9, 2011), *aff'd*, 548 F. App'x. 29 (2d Cir. 2013) ("It is
well-established that prison grievance procedures do not create a due-process-protected liberty
interest."); *Torres v. Mazzuca*, 246 F. Supp. 2d 334, 342 (S.D.N.Y. 2003) ("Prison grievance
procedures do not confer any substantive right upon an inmate requiring the procedural
protections envisioned by the Fourteenth Amendment.")  Consequently, "courts regularly
dismiss claims brought to remedy alleged violations of inmate grievance procedures."  *Martinez
v. Schriro*, No. 14-CV-3965, 2017 WL 87049, at *3 (S.D.N.Y. Jan. 9, 2017) (alteration and
internal quotation marks omitted).  Thus, Plaintiff's due process claim regarding the grievance
procedures at Greene fails as a matter of law.

### 4.  Americans with Disabilities Act and Rehabilitation Act

Plaintiff also asserts a claim under the ADA and the Rehabilitation Act.  (*See* SAC ¶ 12.)
The SAC alleges that various Defendants at Otisville, Wallkill, and Greene, failed to provide
reasonable accommodations with regard to Plaintiff's "heart disease . . . high pertention [sic] . . .
COPD, back problems . . . spine injury[,] and other issues which are well documented in [h]is
medical chart."  (*Id.* ¶ 30.)  As alleged, the Court construes these claims as being against Smith-
Roberts, Roberts, Early, Gerbing, Dr. Koenigsmann, Annucci, Glebocki, Kopp, Jacobsen,
Johnston, Dr. Goulding, Black, Hammond, Steinbach, Smith, and Mauro.

Title II of the ADA provides, in pertinent part, that "no qualified individual with a
disability shall, by reason of such disability, be excluded from participation in or be denied the

benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The Supreme Court has held that Title II extends to inmates in state prisons. *See Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 213 (1998). Similarly, § 504 of the Rehabilitation Act, which also has been held to apply to state prisoners, *see, e.g.*, *Keitt v. New York City*, 882 F. Supp. 2d 412, 425 (S.D.N.Y. 2011), protects a "qualified individual with a disability" from exclusion of participation, denial of benefits, or subjection to discrimination based on the individual's disability "under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).[6]

First, "[i]nsofar as [Plaintiff] is suing the individual [D]efendants in their individual capacities, neither Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suits against state officials," *Garcia v. S.U.N.Y. Health Sciences Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001); *see also Montalvo v. Lamy*, 139 F. Supp. 3d 597, 610 (W.D.N.Y. 2015) ("Under both the ADA and Rehabilitation Act, individuals may not be sued in their individual or personal capacity." (alteration omitted)), and thus those claims must be dismissed.

"Whether individuals can be sued for damages under the ADA or Rehabilitation Act in their *official capacities*, however, is unsettled in th[e] [Second Circuit]." *Jones v. Ng*, No. 14-CV-1350, 2015 WL 998467, at *10 n.20 (S.D.N.Y. Mar. 5, 2015) (emphasis added). Numerous courts in the Second Circuit have held that the ADA and Rehabilitation Act do not provide for liability against individual defendants in their official capacities. *See, e.g., Keitt v. N.Y. State*

---

[6] Because the ADA and Rehabilitation Act "impose identical requirements," *Rodriguez v. City of New York*, 197 F.3d 611, 618 (2d Cir. 1999), courts analyze such claims together, *see, e.g., Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003); *Andino v. Fischer*, 698 F. Supp. 2d 362, 378 (S.D.N.Y. 2010); *see also Hilton v. Wright*, 928 F. Supp. 2d 530, 557 (N.D.N.Y. 2013) ("When brought together, claims under Title II and [§] 504 may be treated identically." (citing *Henrietta*, 331 F.3d at 272)).

*Dep't of Corr. & Cmty. Supervision*, No. 11-CV-855, 2015 WL 2383687, at *21 (W.D.N.Y. May 19, 2015) ("Courts have held that ... individuals [cannot] be named as defendants in ADA or Rehabilitation Act suits in their official or representative capacities."); *Myers v. N.Y. Dep't of Motor Vehicles*, No. 06-CV-4583, 2013 WL 3990770, at *9 (E.D.N.Y. Aug. 5, 2013) ("[N]umerous district courts in this [C]ircuit have persuasively held that there is no individual liability under Title I or Title II of the ADA, regardless of whether the claim is brought in an individual or official capacity."); *Maus v. Wappingers Cent. Sch. Dist.*, 688 F. Supp. 2d 282, 302 n.10 (S.D.N.Y. 2010) ("[I]ndividuals cannot be named as defendants in ADA or Rehabilitation Act suits in their official or representative capacities." (internal quotation marks omitted)); *Carrasquillo v. City of New York*, 324 F. Supp. 2d 428, 441 (S.D.N.Y. 2004) ("Individuals cannot be named as defendants in ADA suits in either their official or representative capacities.").  Yet, other courts have reached the opposite conclusion, *see*, *e.g.*, *Keitt*, 882 F. Supp. 2d at 456-57 (explaining that official capacity suits under the ADA or Rehabilitation Act can proceed in the absence of Eleventh Amendment immunity); *Cole v. Goord*, No. 05-CV-2902, 2009 WL 2601369, at *4–5 (S.D.N.Y. Aug. 25, 2009) (finding that individuals can be sued for damages in their official capacities under the ADA because "the suit addresses the office—a 'public entity'—not the officer personally"), in light of the Second Circuit's decision in *Henrietta D.*, which held that an individual sued for injunctive relief in his or her official capacity is effectively a "public entity" subject to liability under the ADA because the government is the real party in interest in an official capacity suit, *see id.* at 288.

Yet, even under this latter school of thought, any official capacity claims against Defendants would fail.  The Second Circuit has held that an ADA claim for *damages* against a state (or state agency or official) is not barred by the Eleventh Amendment only "if the plaintiff

can establish that the Title II violation was motivated by either discriminatory animus or ill will due to disability." *Garcia*, 280 F.3d at 112; *accord Johnson v. Goord*, No. 01-CV-9587, 2004 WL 2199500, at *19 (S.D.N.Y. Sept. 29, 2004) (dismissing official capacity claims "under [§] 504 of the Rehabilitation Act and Title II of the ADA . . . because those laws do not provide for money damages against the state or state officials in their official capacities, absent a showing that any violation was motivated by discriminatory animus or ill will due to the disability" (citing, inter alia, *Garcia*, 280 F.3d at 108, 111–12)). Here, the SAC is devoid of any allegation that Defendants at Otisville, Wallkill, or Greene acted with discriminatory animus or ill will based on Plaintiff's impairments. (*See generally* SAC.) Rather, Plaintiff contends that he was denied access to a cane at Otisville and Wallkill, denied access to an elevator at Wallkill, and denied access to a bus service at Greene. (SAC ¶¶ 42–45, 50, 89–91, 113–14, 139–40.) Nowhere does Plaintiff allege that any of these denials was rooted in discriminatory animus. In fact, Plaintiff's allegations are replete with facts that indicate Defendants acted to accommodate Plaintiff's medical needs and his alleged disabilities through a host of different treatment methods, including medication, alterations to his living arrangements, and relocation of vital services. (*See, e.g.*, SAC ¶¶ 44–45, 50, 107, 111–12, 114, 140, 143, 153, 160, 181–82.) Thus, even if Plaintiff could bring ADA or Rehabilitation Act claims for monetary damages against Defendants in their official capacities, such claims must be dismissed in light of the absence of allegations of discriminatory animus or ill will. *See Chambers v. Wright*, No. 05-CV-9915, 2007 WL 4462181, at *4 (S.D.N.Y. Dec. 19, 2007) (dismissing ADA and Rehabilitation Act claims where the "[p]laintiff d[id] not make any allegations concerning [the] [d]efendants' discriminatory animus or ill will"); *Renelique v. Goord*, No. 03-CV-525, 2006 WL 2265399, at *11 (N.D.N.Y. Aug. 7, 2006) (dismissing official capacity claims under the ADA where the

plaintiff did "not allege[ ] any facts that would support a conclusion that [the] [d]efendants acted with discriminatory animus or ill will toward him").

## III. Conclusion

For the foregoing reasons, Defendants' Motions To Dismiss are denied as to Plaintiff's Free Exercise claims regarding the scheduling of his medication as against Dr. Goulding, Wolff, Murphy, and Mahmood, but are granted as to all other claims and Defendants.

In light of Plaintiff's pro se status, and because this is the first adjudication of Plaintiff's claims on the merits, the faulty claims are dismissed without prejudice. If Plaintiff wishes to file an Amended Complaint alleging additional facts and otherwise addressing the deficiencies identified above, Plaintiff must do so within 30 days of the date of this Opinion & Order. The failure to do so may result in the dismissal of Plaintiff's claims with prejudice. An amended complaint will replace, and not supplement, the original complaint. If Plaintiff files no Amended Complaint, the Court will assume Plaintiff intends only to proceed with the Free Exercise claims regarding the delivery of his medication during Ramadan.

The Court will hold a status conference on February 1, 2018 at 2:00 PM. The Clerk of Court is respectfully requested to terminate the pending Motions, (*see* Dkt. Nos. 53, 86), and mail a copy of this Opinion & Order to Plaintiff at the address listed on the docket.

SO ORDERED.

Dated:   December 1 , 2017
         White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE