UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DWINEL MONROE,

                                    Plaintiff,

            v.                                              No. 16-CV-2818 (KMK)

NEW YORK STATE DEPARTMENT OF                                <u>OPINION & ORDER</u>
CORRECTIONS AND COMMUNITY
SUPERVISION, *et al.*,

                                    Defendants.

<u>Appearances:</u>

Nimra H. Azmi, Esq.
Muslim Advocates
Washington, DC
*Counsel for Plaintiff*

Colleen Kelly Faherty, Esq.
New York State Office of the Attorney General
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        Dwinel Monroe ("Plaintiff") brings this Third Amended Complaint ("TAC"), pursuant to

42 U.S.C. § 1983, Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101,

*et seq.*, and Section 504 of the Rehabilitation Act ("Rehabilitation Act"), 29 U.S.C. § 701, *et*

*seq.*, against New York State Department of Corrections and Community Supervision

("DOCCS"), Kathleen Gerbing ("Gerbing"), Dr. Herbert E. Goulding ("Dr. Goulding"), Peter

Wolff ("Wolff"), Imam Hafiz Mahmood ("Imam Mahmood"), Rhonda Murray ("Murray"), and

Marie Hammond ("Hammond") (collectively, "Defendants"), alleging that Defendants violated

his constitutional rights by hindering the free exercise of his religious beliefs and failed to

reasonably accommodate his disabilities under the ADA and Rehabilitation Act. (*See generally*

TAC (Dkt. No. 109).)  Before the Court is DOCCS, Gerbing, and Hammond's Motion To

Dismiss Plaintiff's TAC pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(3),

12(b)(6), and 28 U.S.C. §1404 (the "Motion").  (*See generally* Not. of Mot.; Defs.' Mem. of Law

in Supp. of Mot. ("Defs.' Mem.") (Dkt. Nos. 126, 127).)[1]  For the following reasons, the Motion

is granted in part and denied in part.

## I.  Background

### A.  Factual Background

The following facts are drawn from Plaintiff's TAC and the exhibits therein, and are

taken as true for the purpose of resolving the instant Motion.

Plaintiff is a 55-year old individual who was imprisoned in four different DOCCS

facilities from March 8, 2012 to April 6, 2017.  (*See* TAC ¶ 1.)  Specifically, Plaintiff was

housed at Riverview Correctional Facility ("Riverview") in Ogdensburg, New York from March

8, 2015 to June 2015; Otisville Correctional Facility ("Otisville") in Otisville, New York from

June 5, 2015 to September 15, 2015; Wallkill Correctional Facility ("Wallkill") in Wallkill, New

York from September 17, 2015 to October 1, 2015; and Greene Correctional Facility ("Greene")

in Coxsackie, New York from October 1, 2015 until his release on April 6, 2015.  (*Id*. ¶ 21.)

Plaintiff is a Type II diabetic and needs to take insulin daily.  (*Id*. ¶ 2.)  Plaintiff also allegedly

experiences severe lumbar pain from a spine injury, which "requires him to use a cane" and

inhibits his ability to walk "more than short distances."  (*Id*. ¶ 4.)  Plaintiff has also identified as

a practicing Muslim for over 40 years.  (*Id*. ¶ 11.)  Plaintiff believes that fasting during Ramadan

is a "key component" of his religious practice and that consuming any medication, including

---

[1] The Court notes that Defendants stated that "[Dr.] Goulding, [Imam] Mahmood, Murray, and Wolff do not join this [M]otion [T]o [D]ismiss, but instead have filed an answer and are proceeding with discovery."  (Defs.' Mem. 2 n.2.)

insulin, would break his fast, which he considers a "grave sin." (*Id.* ¶ 24.) Plaintiff also believes that prayer is a critical part of his religious practice; specifically, Plaintiff alleges that the "most important prayer of the week is the Jummah prayer," which occurs on Friday afternoons and "must be prayed in congregation." (*Id.* ¶ 25.)

### 1. Events at Otisville

#### a. Plaintiff's Cane

Plaintiff was transferred from Riverview to Otisville in June 2015. (*Id.* ¶ 54.) Although Plaintiff was permitted to use a cane at Riverview, Otisville's medical staff denied his request to use a cane despite Plaintiff's explanation that he could not walk around the "hilly" campus without a cane due to his back pain. (*Id.* ¶ 55.) Otisville staff allegedly referred to a prison policy that barred disabled inmates from possessing canes; instead, they gave Plaintiff a year-long bus pass and bottom bunk passes. (*Id.*) However, without a cane, Plaintiff still had difficulty walking around the hallways of the buildings themselves, and the bus allegedly "regularly" failed to take Plaintiff where he needed to go, such as to activities like the Puppies Behind Bars program, John Jay College courses, and the Compadre Helper Program. (*Id.* ¶ 57.) As a result of not being able to use his cane, Plaintiff alleges that he was denied "meaningful access to the prison services, programs, and activities held at Otisville." (*Id.*)

#### b. Insulin Delivery

On or about June 18, 2015, Plaintiff informed nurse administrator Murray and Otisville's head physician, Dr. Goulding, that he was required to fast during Ramadan. (*Id.* ¶ 28.) He informed them that, despite his diabetes, he had fasted "without incident for many years" and, during Ramadan, took his insulin at sundown. (*Id.*) Dr. Goulding initially approved the request. (*Id.* ¶ 29.) Yet, on June 20, 2015, Wolff, a nurse, informed Plaintiff that, despite Dr. Goulding's

order, Plaintiff would no longer be allowed to take his medicine after sundown, and thus would need to break his fast in order to take his insulin.  (*Id*. ¶ 31.)  Wolff allegedly provided no reason for this change.  (*Id*.)  Plaintiff continued fasting, but when he went to the nurse's office the next evening for his insulin dose at sundown, Wolff told Plaintiff that "the rules would not be changed for Muslims" and threatened to "ticket" Plaintiff.  (*Id*. ¶ 32.)

Plaintiff subsequently met with Dr. Goulding, who again approved the modified insulin delivery schedule on June 22, 2015.  (*Id*. ¶ 33.)  However, later, on July 2, 2015, Plaintiff was once again informed by Wolff that Dr. Goulding had rescinded the modified medicine insulin delivery schedule.  (*Id*. ¶ 34.)  Plaintiff later discovered that Dr. Goulding had rescinded the schedule because Imam Mahmood, Otisville's Muslim Chaplain, had told Wolff that Muslims do not need to fast during Ramadan "in situations involving medical necessity."  (*Id*. ¶ 35.)  At one point, another doctor, Dr. Ferdous, reinstated the modified insulin delivery schedule to accommodate Plaintiff's desire to fast for Ramadan, but Wolff and Dr. Goulding once again rescinded that decision, allegedly "angrily instruct[ing Plaintiff] that he could either receive his medication before sundown or he would be denied his insulin wholesale."  (*Id*. ¶ 39; *see also id*. ¶¶ 37–38.)

Plaintiff continued to fast and, as a result, experienced "pain, dizziness, shaking, and sweating" due to insulin deprivation.  (*Id*. ¶ 40.)  Due to his health problems, Plaintiff was ultimately forced to break his fast to continue his insulin treatment.  (*Id*.)  In total, Plaintiff alleges that the actions of Wolff, Dr. Goulding, Imam Mahmood, and Murray forced him to give up eight days of fasting for Ramadan that year.  (*Id*.)  Plaintiff alleges that no "health, security, or other valid penological interest" justified this loss.  (*Id*. at ¶ 42.)

Plaintiff filed numerous grievances with Otisville officials. (*Id.* ¶ 43.) Gerbing, the Superintendent of Otisville, denied one of those grievances, citing "Islamic jurisprudence" as a reason why "special accommodations for medication distribution are not required." (*Id.*)

On October 28, 2015, the DOCCS Central Office Review Committee ("CORC") upheld Gerbing's determination, stating that Islamic jurisprudence "provides for an observer of Ramadan to be exempt from fasting when it is medically necessary to take medications for their health and that special accommodations for medication distribution are not required." (*Id.* ¶ 44.) Plaintiff further alleges that at other DOCCS institutions where he was incarcerated, he was permitted to have a modified insulin delivery schedule to accommodate his Ramadan practice. (*Id.* ¶ 45.)

### 2. Events at Greene

Plaintiff arrived at Greene on October 1, 2015. (*Id.* ¶ 46.) Plaintiff alleges that Greene has a North Side and a South Side that are approximately one mile apart, which Plaintiff was allegedly "[u]nable to traverse . . . due to his back pain and difficulty walking." (*Id.* ¶ 47.) At the time that Plaintiff was transferred to Greene, there were no Jummah prayer services available at the South Side, where Plaintiff was housed. (*Id.* ¶ 48.)

On or around October 22, 2015, Plaintiff alleges that he filed a grievance with Hammond, the Deputy Superintendent of Programs at Greene, requesting either access to Jummah prayers through bus service or to be transferred to another facility. (*Id.* ¶ 49.) Plaintiff alleges that no one even responded to his grievance for over two months, until January 2, 2016. (*Id.*) After the grievance was processed, Hammond did not provide Plaintiff with his requested relief but instead stated that the prison would relocate Jummah services to the South Gym, a location "proximate" and "accessible" to Plaintiff's dormitory. (*Id.* ¶ 51.) However, Jummah prayer services never

actually occurred at the South Gym during Plaintiff's time at Greene. (*Id.* ¶ 52.) Even after "several months' delay," the prayer services were moved to a visiting room on the South Side, which was still "at a significant distance from [Plaintiff's] dormitories such that [Plaintiff] could not access Jummah prayer services without experiencing severe pain from his mobility and respiratory disabilities." (*Id.*)

Plaintiff alleges that, because Jummah was never relocated to an accessible location, he was "denied meaningful access to Jummah prayer" for approximately 75 Friday services at Greene. (*Id.* ¶ 52–53.)

### 3. Events at Wallkill

At Wallkill, where Plaintiff was housed from September 17 to October 1, 2015, Plaintiff asked for his cane and requested an elevator pass. (*Id.* ¶¶ 21, 58.) Both requests were denied by the Superintendent, who informed Plaintiff that the prison had a policy forbidding disabled inmates from using canes and that elevators were only used for laundry. (*Id.* ¶ 58.) Plaintiff alleges that, because of this denial, he was "deprived of meaningful access to Wallkill's program and facilities, like the Correctional Industries program and vocational training programs," which "nondisabled inmates were [allegedly] able to access." (*Id.* ¶ 59.)

As a result of the conduct taking place at Otisville, Wallkill, and Greene, Plaintiff seeks actual, compensatory, and punitive damages to remedy the alleged violation of his First Amendment rights and his rights under the ADA and Rehabilitation Act, as well as attorneys' fees and expenses. (*See id.* at 18.)

### B. Procedural History

Details about the early procedural history of this case can be found in this Court's December 27, 2017 Opinion & Order partially granting and partially denying Defendants'

Motion to Dismiss the Second Amended Complaint ("SAC"). (*See generally* Op. & Order on

Mot. To Dismiss the SAC ("Opinion") (Dkt. No. 92).) An abbreviated version is below.

On April 14, 2016, Plaintiff, proceeding pro se at the time, brought suit against numerous

named and multiple John Doe defendants, many of whom have been dismissed from the case.

(Opinion 10, 36.) On September 30, 2016, Plaintiff filed an Amended Complaint, (*see* Am.

Compl. (Dkt. No. 42)), but was instructed by the Court to file a second amended complaint to

address certain deficiencies in his pleadings, (*see* Dkt. No. 44). Plaintiff thereafter filed his SAC

on October 26, 2016. (*See* SAC (Dkt. No. 48).) The Court issued an Opinion & Order partially

dismissing Plaintiff's SAC on December 27, 2017. (*See generally* Opinion.)

Plaintiff, now represented by counsel, filed his TAC on July 20, 2018. (*See generally*

TAC.) Defendants DOCCS, Hammond, and Gerbing filed the instant Motion on December 14,

2018. (*See generally* Not. of Mot.; Defs.' Mem.) Plaintiff filed an Opposition on January 14,

2019. (*See* Pl.'s Mem. of Law in Opp. to Mot. ("Pl.'s Mem.") (Dkt. No. 128).) Defendants filed

a Reply on February 7, 2019. (Defs.' Reply in Supp. of Mot. ("Defs.' Reply") (Dkt. No. 137).)

## II. Discussion

### A. Standard of Review

#### 1. Rule 12(b)(6)

The Supreme Court has held that, while a complaint "does not need detailed factual

allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his

entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)

(citations, quotation marks, and alterations omitted). Indeed, Rule 8 of the Federal Rules of Civil

Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (quotation marks and alteration omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff need allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

In considering a motion to dismiss, the Court "must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) ("In addressing the sufficiency of a complaint we accept as true all factual allegations . . . ." (quotation marks omitted)). Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court . . . draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir.

2012)). Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks and citation omitted).

### 2. Rule 12(b)(3)

On a motion to dismiss a complaint under Rule 12(b)(3) for improper venue, "the plaintiff bears the burden of establishing that venue is proper." *Ne. Landscape & Masonry Assocs., Inc. v. State of Conn. Dep't of Labor*, No. 14-CV-9104, 2015 WL 8492755, at *2 (S.D.N.Y. Dec. 10, 2015) (quoting *Fedele v. Harris*, 18 F. Supp. 3d 309, 316 (E.D.N.Y. 2014)). In analyzing a claim of improper venue, the court must view all facts in the light most favorable to the plaintiff. *See Phillips v. Audio Active Ltd.*, 494 F.3d 378, 384 (2d Cir. 2007). Thus, a "[c]ourt must accept the facts alleged in the complaint and construe all reasonable inferences in the plaintiff's favor." *Ne. Landscape*, 2015 WL 8492755, at *2 (quoting *Matera v. Native Eyewear, Inc.*, 355 F. Supp. 2d 680, 681 (E.D.N.Y. 2005)).

The permissible venue in this Action is determined by the general venue provision for cases involving a federal question. *See* 28 U.S.C. § 1391(b). Under that statute, venue can be laid "in either (1) the district of the defendant's residence; (2) the district where a substantial part of the events giving rise to the claim occurred; or (3) if neither of those can be applied, any district where a defendant is subject to personal jurisdiction." *Ne. Landscape*, 2015 WL 8492755, at *2 (citing *Cooney v. Barry Sch. Of Law*, 994 F. Supp. 2d 268, 271 (E.D.N.Y. 2014)). "[W]hen a plaintiff relies on [§] 1391(b)(2) to defeat a venue challenge," a district court must engage in a two-step inquiry: first, "identify the nature of the claims and the alleged acts or

omissions giving rise to the claims;" and second, "determine whether a substantial part of the acts or omissions occurred in the district where the suit was filed." *Fedele*, 18 F. Supp. 3d at 316 (citing *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 432 (2d Cir. 2005)). For venue to be proper under § 1391(b)(2), "*significant* events or omissions *material* to the plaintiff's claim must have occurred in the district in question, even if other material events occurred elsewhere." *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 357 (2d Cir. 2005) (emphasis in original). However, "[w]hen considering a motion to dismiss for improper venue under Rule 12(b)(3), 'the plaintiff need only make a prima facie showing of venue.'" *See Dash v. Bank of Am. Corp.*, No. 18-CV-4807, No. 18-CV-4807, 2019 WL 1780140, at *4 (S.D.N.Y. Apr. 23, 2019) (quoting *Gulf Ins. Co.*, 417 F.3d at 355). Where venue is improper, a court "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." *Fedele*, 18 F. Supp. 3d at 319 (quoting 28 U.S.C. § 1406(a)); *see also Daniel*, 428 F.3d at 435 (noting that a court must decide whether to "simply affirm dismissal on these [improper venue] grounds or, in the interest of justice, order transfer of the action to another district where jurisdiction and venue properly obtain").

Even where venue is proper, a court may, "[f]or the convenience of parties and witnesses, in the interest of justice, . . . transfer any civil action to any other district court or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). In determining whether to transfer, courts should first inquire "whether the action could have been brought in the transferee district." *Nelson v. Wells Fargo Bank, N.A.*, No. 17-CV-4045, 2019 WL 2514229, at *7 (S.D.N.Y. June 18, 2019) (quoting *Everlast World's Boxing Headquarters Corp. v. Ringside, Inc.*, 928 F. Supp. 2d 735, 743 (S.D.N.Y. 2013)). Following that, the Court must consider a variety of other factors, including:

> (1) the convenience of the witnesses; (2) the convenience of the parties; (3) the location of relevant documents and the relative ease of access to sources of proof; (4) the locus of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) the forum's familiarity with the governing law; (8) the weight accorded the plaintiff's choice of forum; and (9) trial efficiency and the interests of justice.

*Id.* On a motion to transfer venue pursuant to § 1404(a), the "burden rests on the moving party to make a clear and convincing showing that the balance of these factors favors their choice of forum." *Lapa v. Massage Envy Franchising, LLC*, No. 18-CV-7403, 2019 WL 2004072, at *2 (S.D.N.Y. May 7, 2019) (citation and quotations omitted).

### 3. Rule 12(b)(1)

"A federal court has subject matter jurisdiction over a cause of action only when it has authority to adjudicate the cause pressed in the complaint." *Bryant v. Steele*, 25 F. Supp. 3d 233, 241 (E.D.N.Y. 2014) (quotation marks omitted) (quoting *Arar v. Ashcroft*, 532 F.3d 157, 168 (2d Cir. 2008), *vacated and superseded on reh'g on other grounds*, 585 F.3d 559 (2d Cir. 2009) (en banc)). "Determining the existence of subject matter jurisdiction is a threshold inquiry[,] and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (citation and quotation marks omitted), *aff'd*, 561 U.S. 247 (2010); *see also United States v. Bond*, 762 F.3d 255, 263 (2d Cir. 2014) (describing subject matter jurisdiction as the "threshold question" (quotation marks omitted) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88–89 (1998))). "In adjudicating a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), the court may consider matters outside the pleadings." *JTE Enters., Inc. v. Cuomo*, 2 F. Supp. 3d 333, 338 (E.D.N.Y. 2014) (citing *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). A "plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of

the evidence that it exists." *Chabot v. County of Rockland*, No. 18-CV-4109, 2019 WL 3338319, at *5 (S.D.N.Y. July 25, 2019) (quoting *Sobel v. Produenti*, 25 F. Supp. 3d 340, 352 (E.D.N.Y. 2014)).

B. Analysis

1. First Amendment Claims

a. Personal Involvement of Gerbing and Hammond

Defendants argue, with respect to Plaintiff's First Amendment claims, that Plaintiff failed to plausibly allege the personal involvement of Gerbing and Hammond. (Defs.' Mem. 5–9.)

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F. 3d 133, 138 (2d Cir. 2013). To establish personal involvement, a plaintiff must show that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* at 139 (italics and quotation marks omitted) (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)). In other words, "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

Plaintiff has failed to plausibly allege Gerbing's personal involvement. Gerbing denied one of Plaintiff's insulin-related grievances, citing to "Islamic jurisprudence," on July 28, 2015. (TAC ¶ 43.) Ramadan ended on July 17, 2015. (*Id.* ¶ 27.) Although Gerbing responded to the

grievance—which can sometimes establish personal involvement under § 1983, *see Pugh v. Goord*, 571 F. Supp. 2d 477, 513–14 (S.D.N.Y. 2008) (holding that plaintiff had plausibly alleged personal involvement of a defendant who had "personally . . . deni[ed]" grievances regarding Shi'ite services) —"the distinction [here] is [that Gerbing was] confronted with an alleged violation that ha[d] ended," *Harnett v. Barr*, 538 F. Supp. 2d 511, 524 (N.D.N.Y. Mar. 7, 2008) (citation and quotation marks omitted); *see also Perez v. Annucci*, No. 18-CV-147, 2019 WL 1227801, at *3 (S.D.N.Y. Mar. 15, 2019) ("[I]f a supervisor defendant is confronted with a violation that has already occurred and is not ongoing, then the official will not be found personally responsible for failing to remedy the violation." (citation, quotation marks, and alteration omitted)); *Thatcher v. N.Y. State Dep't of Corr. and Cmty. Supervision*, No. 16-CV-2310, 2018 WL 5791973, at *4 (S.D.N.Y. Nov. 5, 2018) (holding that the plaintiff failed to allege personal involvement of a reviewing officer who denied a grievance weeks after the violation had ended); *Allah v. Annucci*, No. 16-CV-1841, 2018 WL 4571679, at *9 (S.D.N.Y. Sept. 24, 2018) (holding that denial of a grievance pertaining to attendance at religious events was not sufficient to allege personal involvement where the denials occurred after the "discrete" alleged events had ended).  At the time that Gerbing denied Plaintiff's grievance, the alleged interruptions of Plaintiff's fast were no longer an "ongoing constitutional violation," nor one that Gerbing could "remedy directly" because Ramadan had already ended.  *Harnett*, 538 F. Supp. at 524.  Gerbing's July 28, 2015 response to Plaintiff's grievance does not by itself indicate that Gerbing participated in Plaintiff's alleged (and already completed) Free Exercise violations as to Plaintiff's Ramadan-related allegations at Otisville.  (*See* TAC ¶ 43.)  Nor has Plaintiff plausibly alleged that Gerbing otherwise participated in his alleged deprivation of Free Exercise rights at Otisville.  Merely having a supervisory role at the prison also does not establish Gerbing's

liability. *See Iqbal*, 556 U.S. at 676 ("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *Banks v. Annucci*, 48 F. Supp. 3d 394, 416 (N.D.N.Y. 2014) ("Where a defendant is a supervisory official, a mere 'linkage' to the unlawful conduct through the 'chain of command' . . . is insufficient to show his or her personal involvement in that unlawful conduct." (citing, inter alia, *Polk County v. Dodson*, 454 U.S. 312, 325 (1981), and *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003))). Accordingly, Plaintiff's Free Exercise claim against Gerbing is dismissed.

In contrast, Plaintiff has plausibly alleged Hammond's personal involvement with regard to his alleged First Amendment violations at Greene. Hammond responded directly to Plaintiff's "ongoing" grievances regarding his inability to participate in Jummah prayer services because of his disability. (*See* TAC ¶¶ 49–52.) The TAC alleges that Hammond knew that Plaintiff was unable to attend Jummah services and still denied Plaintiff's request for a bus pass to access or to be transferred to another facility, (*see id*. ¶ 51), establishing a ground for demonstrating "direct[]" participation in Plaintiff's alleged constitutional violation. *See Grullon*, 720 F.3d at 139. Further, the Complaint plausibly alleges that Hammond "failed to remedy the wrong" by not moving Jummah prayer services to an accessible location for Plaintiff. *Id.* (italics omitted). The situation was allegedly never rectified, and, unlike the Otisville Ramadan allegations, here, Jummah services occurred every Friday throughout the calendar year. (TAC ¶ 25.) Thus, there was no "discrete" period of harm that had ended prior to Hammond's allegedly ineffective response. *Allah*, 2018 WL 4571679, at *9. By alleging that Hammond was aware of Plaintiff's inability to attend Jummah services and failed to rectify the situation, Plaintiff has plausibly alleged that Hammond enabled an "ongoing" violation of his First Amendment rights. *See*

*Harnett*, 538 F. Supp. 2d at 524. This is enough to establish Hammond's personal involvement at this stage.

### b. Qualified Immunity

Defendants argue that, regardless of personal involvement, Hammond is entitled to qualified immunity. (*See* Defs.' Mem. 11.)[2]

"Qualified immunity protects officials from liability for civil damages as long as 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Taravella v. Town of Wolcott*, 599 F.3d 129, 133 (2d Cir. 2010) (ultimately quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In determining whether a right is clearly established, the "inquiry turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Pearson v. Callahan*, 555 U.S. 223, 244 (2009) (citation and quotation marks omitted). "In the Second Circuit, 'a right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful.'" *Schubert v. City of Rye*, 775 F. Supp. 2d 689, 702 (S.D.N.Y. 2011) (quoting *Luna v. Pico*, 356 F.3d 481, 490 (2d Cir. 2004)). Further, qualified immunity is an affirmative defense, so a defendant bears the burden of the proof. *See Lore v. City of Syracuse*, 670 F.3d 127, 149–50 (2d Cir. 2012). Where the qualified immunity defense is raised "at the motion to dismiss stage, defendants must accept a more stringent standard." *Grimaldi v. County of Putnam*, No. 17-CV-622, 2019 WL 3499543, at *4 (S.D.N.Y. Aug. 1, 2019) (citation and quotation marks omitted).

---

[2] Defendants also argued that Gerbing should be entitled to qualified immunity. (Defs.' Mem. 11.) Because the claim as to Gerbing was dismissed on personal involvement grounds, the Court does not address the issue of Gerbing's qualified immunity here.

"Not only must the facts supporting the defense appear on the face of the complaint, but . . . the motion may be granted only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004) (citations, quotation marks, and alterations omitted).

At the time of the alleged violation, it was already "well established that prisoners have a constitutional right to participate in congregate religious services." *Salahuddin v. Coughlin*, 993 F.2d 306, 308 (2d Cir. 1993); *see also O'Lone v. Estate of Shabazz*, 482 U.S. 342, 345 (1987) (noting specifically that Jummah is "commanded by the Koran" and is "a weekly Muslim congregational service" that "must be held every Friday after the sun reaches its zenith"). "Denying an inmate congregate religious services over a prolonged period substantially burdens that right." *Jones v. Malin*, No. 15-CV-5381, 2017 WL 985943, at *3 (S.D.N.Y. Mar. 13, 2017) (quotation marks omitted) (citing *Salahuddin*, 467 F.3d at 277). However, the right to free exercise "is not absolute or unbridled" and may be "subject to valid penological concerns." *Johnson v. Guiffere*, No. 04-CV-57, 2007 WL 3046703, at *4 (N.D.N.Y. Oct. 17, 2007) (citing *O'Lone*, 482 U.S. at 348).

Here, Defendants have not met their burden with regard to Hammond's qualified immunity defense. Plaintiff has plausibly alleged that he holds sincere Muslim beliefs, which include his belief that he is required to attend Jummah congregational prayers every Friday. (*See* TAC ¶¶ 25–26.) Plaintiff's right to access Jummah congregational prayer services is also clearly established, as discussed above. *See O'Lone*, 482 U.S. at 345; *Salahuddin*, 993 F.3d at 308; *Jones*, 2017 WL 985943, at *3. Additionally, Defendants have failed to provide a "valid penological concern" as to why Plaintiff's request for a bus pass to the North Side was rejected, (*id*. ¶ 51), why the relocation of the Jummah prayer services did not occur in a "timely manner,"

(*see* TAC Ex. 2 ("Grievance")), and why, ultimately, the South Gym was deemed an "inappropriate" location for Jummah prayer services, preventing Plaintiff from being able to access prayer services for 75 Fridays, (*see* TAC ¶ 52–53). Drawing all inferences in favor of Plaintiff, Defendants have not shown that "reasonable persons in their position would not have understood that their conduct was within the scope of the established prohibition." *See Labounty v. Coughlin*, 137 F.3d 68, 73 (2d Cir. 1998) (citation and quotation marks omitted). At this stage, the Court declines to grant Hammond qualified immunity as to Plaintiff's Free Exercise claim. *See, e.g.*, *Kravitz v. Annucci*, No. 16-CV-8999, 2019 WL 1429546, at *6 (S.D.N.Y. Mar. 29, 2019) (refusing to grant qualified immunity to defendants who, without providing justification, refused to take plaintiff to congregational prayers one night and interrupted congregational prayers another night); *Jones*, 2017 WL 985943, at *4 (refusing to grant qualified immunity without a "more complete record" that would allow the court to understand whether it was "objectively reasonable" for the defendants to deny inmate plaintiff "congregate religious services for two months"); *Pugh*, 571 F. Supp. 2d at 512 (refusing to grant qualified immunity at summary judgment where prison officials refused to let Shi'ite and Sunni inmates have separate Jummah services because the record was not developed enough to show justified "legitimate penological interests" in denying the plaintiffs a "reasonable opportunity to worship").

## 2. ADA and Rehabilitation Act Claims

Defendants argue that Plaintiff has failed to make "non-conclusory" allegations that Plaintiff was actually excluded from any particular activity because of his disability. (Defs.' Mem. 9.) Defendants also argue that, due to state sovereign immunity, this Court lacks jurisdiction to hear Plaintiff's ADA claim. (*See id*. at 10.) Further, Defendants argue that, in any

event, Plaintiff's ADA and Rehabilitation Act claims should be dismissed because Plaintiff

failed to "engage in the interactive process envisioned by the ADA." (*Id*. at 10.)

"In order to state a violation of Title II, a plaintiff must allege that: 1) he or she is a

qualified individual with a disability; and 2) he or she is being excluded from participation in, or

being denied the benefits of[,] some service, program, or activity by reasons of his or her

disability." *See Elbert v. N. Y. State Dep't of Corr. Servs.*, 751 F. Supp. 2d 590, 594–95

(S.D.N.Y. 2010) (citing *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 85 (2d Cir. 2004)).

Section 504 of the Rehabilitation Act imposes nearly identical requirements, and courts may

conduct the analysis congruently. *See Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir.

2003); *Meekins v. City of New York, N.Y.*, 524 F. Supp. 2d 402, 406 (S.D.N.Y. 2007). The

second prong of a Title II violation may be satisfied, at least at the motion to dismiss stage, by

allegations that a disabled prisoner has been "treated differently" or "denied services that have

been provided to other prisoners" due to the disability. *Elbert*, 751 F. Supp. 2d at 595–96.

For ADA claims against DOCCS, Plaintiff faces the additional hurdle of sovereign

immunity.[3]  Sovereign immunity, stemming from the Eleventh Amendment, bars suits by

individuals against a state or state agencies without that state's consent. *See Elbert*, 751 F. Supp.

2d at 593.  A claim barred by a state's sovereign immunity must be dismissed for lack of subject

matter jurisdiction. *See Henny v. New York State*, 842 F. Supp. 2d 530, 544 (S.D.N.Y. Jan. 30,

---

[3] DOCCS has waived sovereign immunity for private suits based on the Rehabilitation
Act. *See Degrafinreid v. Ricks*, 417 F. Supp. 2d 403, 413–14 (S.D.N.Y. 2006) ("The Second
Circuit, as well as all other intermediate federal courts, has held that Congress intended states'
acceptance of federal funds to constitute waiver of their Eleventh Amendment immunity as to
claims under the Rehabilitation Act." (citing *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*,
280 F.3d 98, 113 (2d Cir. 2001))), *reconsidered on other grounds by Degrafinreid v. Ricks*, 452
F. Supp. 2d 328 (S.D.N.Y. 2006).  Defendants appear to agree that they are arguing sovereign
immunity applies only to the ADA claims and not the Rehabilitation Act claims.  (*See* Defs.'
Reply 4 n.4.)

2012) (collecting cases).  To abrogate state sovereign immunity in ADA cases, a court should

consider "(1) which aspects of the State's alleged conduct violated Title II; (2) to what extent

such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct

violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported

abrogation of sovereign immunity as to that class of conduct is nevertheless valid."  *United

States v. Georgia*, 546 U.S. 151, 159 (2006).  Judges in this District have interpreted the second

clause of the *Georgia* test to mean that the violation of a constitutional right "incorporated

against the states through the Fourteenth Amendment" could abrogate sovereign immunity for

Title II actions seeking monetary damages.  *Degrafinreid*, 417 F. Supp. 2d at 413; *see also Colón

v. N.Y. State Dep't of Corrs. and Cmty. Supervision*, No. 15-CV-7432, 2017 WL 4157372, at *6

(S.D.N.Y. Sept. 15, 2017) (explaining that plaintiffs must show first, a violation of Title II, and

second, either a violation of the Fourteenth Amendment, or a violation of the third *Georgia*

prong to successfully survive sovereign immunity in ADA cases).

In *Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn*, 280 F.3d 98, 112 (2d Cir.

2001), the Second Circuit held that sovereign immunity would not protect a state or state

agencies from private suits for money damages under Title II of the ADA as long as "the

plaintiff can establish that the Title II violation was motivated by either discriminatory animus or

ill will due to disability."  280 F.3d at 112.  However, in light of the Supreme Court's holding in

*Georgia*, "[i]t is unclear whether *Garcia*'s requirement of establishing animus or ill will to

abrogate a state's Eleventh Amendment immunity remains."  *Scalercio-Isenberg v. Port Auth. of

N.Y.*, No. 16-CV-8494, 2018 WL 1633767, *8 n.13 (S.D.N.Y. Mar. 31, 2018) (citations omitted);

*see also Olson v. State of New York*, No. 04-CV-419, 2007 WL 1029021, at *7 (E.D.N.Y. Mar.

30, 2007) ("The Second Circuit, moreover, has yet to address the fate of *Garcia* in the wake of

*Lane* and *Georgia*, even though district courts in this Circuit have adopted divergent positions as to whether *Georgia* has been abrogated." (citations omitted)).  Many courts in the Second Circuit have used the discriminatory animus or ill will test laid out in *Garcia* to inform its analysis of the third clause of the *Georgia* test, whether "misconduct [that] violated Title II but did not violate the Fourteenth Amendment" could still fall within "Congress's purported abrogation of sovereign immunity."  *Georgia*, 546 U.S. at 159; *see Olson*, 2007 WL 1029021, at *7 (collecting cases).

Here, Plaintiff has alleged that he suffers from severe lumbar pain and needs a cane to walk anything "more than short distances," plausibly alleging his eligibility for Title II protection.[4]  (TAC ¶ 4.)  Plaintiff's claims that he could not access Jummah prayers at Greene plausibly allege that, due to his disabilities, he was unable to access prayer services that other, non-disabled inmates could access.  (*Id.* ¶ 52.)  For the Otisville and Wallkill-related claims, Plaintiff alleged that, due to his inability to navigate the prison campus, Plaintiff was not given "meaningful access" to "services, programs, and activities" that other inmates could access.  (*Id.* ¶ 57–59.)  This included access to college courses and a vocational training program.  (*See id.*)  This plausibly alleges that Plaintiff was "treated differently because of his . . . disability."  *See Elbert*, 751 F. Supp. 2d at 595.  Whether the relocation of Jummah services to the visiting room on the South Side at Greene or the (allegedly faulty) bus access at Otisville constituted "reasonable accommodations" cannot be established on the pleadings alone and are better suited for resolution on the basis of a more developed record.  *See Wright v. N.Y. Dep't of Corrs.*, 831 F.3d 64, 73–76 (2d Cir. 2016) (holding that the question of whether a mobility program was

---

[4] Defendants have not contested that Plaintiff has plausibly alleged his disability status. (*See generally* Defs.' Mem.)

20

reasonable and whether it functioned as intended were questions of facts to be determined at trial). Therefore, the Plaintiff has plausibly alleged claims under the Rehabilitation Act.

Next, Plaintiff's allegations regarding ADA-based discrimination must face the question of sovereign immunity. Regarding Plaintiff's ADA claims at Otisville and Wallkill, Plaintiff only alleges that he was denied access to certain "prison services, programs, and activities." (TAC ¶ 57; *see also id*. ¶ 59.) Although this may be a violation of Title II, there is no allegation suggesting that an underlying constitutional right was violated. Therefore, sovereign immunity cannot be abrogated on those grounds. *Georgia* also permits abrogation of sovereign immunity where a plaintiff alleges "misconduct [that] violated Title II but did not violate the Fourteenth Amendment" if a court determines that "Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." 546 U.S. at 159. As discussed, courts in this Circuit have interpreted this to mean that abrogation may "nevertheless [be] valid" pursuant to *Georgia* if there are plausible allegations of "animus" or "ill will," as defined by the Second Circuit in *Garcia*. *Garcia*, 280 F.3d at 111–12 (requiring a showing of "irrational prejudice" or actions "wholly lacking a legitimate government interest" (citation omitted)). However, here, no such plausible allegations exist. Plaintiff alleges no facts indicative of animus at Wallkill at all. (*See* TAC ¶¶ 58–59.) As to Otisville, Plaintiff alleges that officials even attempted to accommodate his disability by providing a bus pass. (*See id*. ¶ 57.) Because the TAC contains no plausible allegations of animus, Plaintiff's claims must be dismissed on sovereign immunity grounds. *See Sharif v. Coombe*, 655 F. Supp. 2d 274, 305 (S.D.N.Y. 2013) (holding that providing accommodations, even if imperfect, "is not behavior consistent with a harboring of animus or ill will toward disabled inmates"); *Nails v. Laplante*, 596 F. Supp. 2d 475, 481–82 (D.

Conn. 2009) (dismissing case where plaintiff "does not include any non-conclusory allegations of discriminatory animus or ill will based on his disability").

At Greene, where Plaintiff was allegedly unable to access the location of Jummah prayer services due to his disability, the ADA claim pertains to an alleged underlying violation of Plaintiff's First Amendment rights, pursuant to the Free Exercise clause.[5] Like in *Degrafinreid*, in which the plaintiff alleged an Eighth Amendment violation, Plaintiff here has alleged the violation of a fundamental constitutional right "incorporated against the states through the Fourteenth Amendment." *See Degrafinreid*, 417 F. Supp. 2d at 413. Accordingly, as to the Greene-related events, DOCCS is not shielded by sovereign immunity.

Defendants also raise the question of "whether Plaintiff informed anyone that the relocation of Jummah services was unsuitable" and whether Plaintiff "engage[d] in the interactive process envisioned by the ADA." (Defs.' Mem. 10.) The Second Circuit has held that, when an inmate complains to DOCCS about the grievance at issue and the grievance is not addressed, the "failure to engage in an interactive process . . . is DOCCS's shortcoming, not [the plaintiff's]." *Wright*, 831 F.3d at 80. Plaintiff alleges that he notified DOCCS about his inability to attend Jummah services on the North Side. (TAC ¶ 40.) Plaintiff attaches to his Complaint a

---

[5] The Free Exercise clause of the First Amendment was first incorporated via the Fourteenth Amendment against state governments in *Cantwell v. Connecticut*, 310 U.S. 296 (1940). It has long been acknowledged as a fundamental constitutional right in American jurisprudence. *See Wisconsin v. Yoder*, 406 U.S. 205, 214 (1972) (noting how the "right to free exercise of religious beliefs" is a "fundamental right"); *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943) (describing "freedom of worship" as a "fundamental right").

The Court recognizes that, in the Second Circuit, "[t]he free exercise claims of prisoners are . . . judged under a reasonableness test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003). However, the "reasonableness" of the circumstances presented here is better adjudicated on a more developed record. This limitation does not affect the question of whether a right is "fundamental" for the purposes of a sovereign immunity analysis.

grievance filed at Greene noting that, despite DOCCS's proposed resolution to move services to the South Side, Jummah had "never been in the South Gym" and that he would like the "matter addressed." (Grievance.) Plaintiff therefore has plausibly alleged participation in the interactive process contemplated by the ADA, and the Court will not dismiss Plaintiff's Title II claims as to Greene on this ground at this time.[6]

In sum, all of Plaintiff's Rehabilitation Act claims remain in the case. Plaintiff's ADA claims against DOCCS are treated as follows: the Otisville and Wallkill-related claims are dismissed on sovereign immunity grounds, and the Greene claim remains because it involves sufficient allegations of both discriminatory treatment and a violation of a constitutional right.

### 3. Venue

Defendants further argue that allegations regarding the violations at Greene are either improperly venued, pursuant to 28 U.S.C. § 1391(b), or, if they are properly venued, should be transferred to the Northern District of New York, pursuant to 28 U.S.C. § 1404(a). (Defs.' Mem. 14–17.) The Court disagrees.

Under 28 U.S.C. § 1391(b), venue is appropriate in:

> (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought . . ., any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

---

[6] Because Title II-related claims pertaining to the events at Otisville and Wallkill have already been dismissed on other grounds, the Court does not address the issue of engaging with the interactive process at those locations.

28 U.S.C. § 1391(b).  For purposes of venue, state employee defendants are considered residents

of the district in which they work.  *See Smolen v. Brauer*, 177 F. Supp. 3d 797, 801 (W.D.N.Y.

2016).  Gerbing, Dr. Goulding, Murray, and Imam Mahmood all worked at Otisville, which is in

this District.  (TAC ¶¶ 13–14, 16–17.)  Because all other Defendants are also residents of New

York, this alone makes the Southern District of New York a proper venue under § 1391(b)(1).

Even if this were not the case, a "substantial part of the events," including the alleged Free

Exercise claims related to insulin distribution and alleged faulty accommodation of Plaintiff's

disability, occurred at Otisville in this District.  28 U.S.C. § 1391(b); *see also Marshall v.*

*Annucci*, No. 16-CV-8622, 2018 WL 1449522, at *10–11 (S.D.N.Y. Mar. 22, 2018) (holding

that substantiality is "more a qualitative than a quantitative inquiry" and noting that § 1391(b)(2)

"does not restrict venue to the district in which the most substantial events or omissions . . .

occurred" (citation, italics, and quotation marks omitted)).

Even if venue is proper, a court may transfer an action to a different venue pursuant to 28

U.S.C. § 1404(a) "[f]or the convenience of parties" and "in the interest of justice."  28 U.S.C §

1404(a).  When making this determination, courts should engage in a two-part inquiry.  First, the

Court should consider "whether the action could have been brought in the proposed transferee

forum; and second, whether the transfer would promote the convenience of parties and witnesses

and would be in the interests of justice."  *See Solar v. Annetts*, 707 F. Supp. 2d 437, 442

(S.D.N.Y. 2010) (citation and quotation marks omitted).  With regard to the second prong, courts

weigh the following factors: "(1) the plaintiff's choice of forum, (2) the convenience of

witnesses, (3) the location of relevant documents and relative ease of access to sources of proof,

(4) the convenience of parties, (5) the locus of operative facts, (6) the availability of process to

compel the attendance of unwilling witnesses, and (7) the relative means of the parties."  *N.Y.*

*Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 112 (2d Cir. 2010) (citation and quotation marks omitted). Generally, the plaintiff's choice of forum "weighs heavily against transfer." *Marshall*, 2018 WL 1449522, at *11; *see also Gross v. British Broad. Corp.*, 386 F.3d 224, 230 (2d Cir. 2004) ("[A] plaintiff's choice of forum is presumptively entitled to substantial deference." (citation omitted)).

Here, the first prong of the test is satisfied. Just as Plaintiff could have brought this action in this District, where the Otisville defendants reside, Plaintiff could also have brought this action in the Northern District of New York, where Hammond resides. (*See* TAC ¶ 18.) However, upon weighing the factors of convenience, the Court sees no reason to disturb Plaintiff's choice of forum and transfer the case to the Northern District. Most of the individual defendants reside in the Southern District of New York. (*See* TAC ¶¶ 13–17.) Plaintiff is an individual, relatively recently released from incarceration, who also resides in the Southern District and faces mobility problems. (*See id.* ¶ 11.) He has lesser means than DOCCS. Moreover, the location of documents does not generally weigh in favor of transfer, even if many of them are outside this District. *See Winter v. Am. Inst. of Med. Scis. & Educ.*, 242 F. Supp. 3d 206, 217 (S.D.N.Y. 2017) (holding that ease of access to documents and other sources is relatively "neutral" in light of electronic discovery). Defendants' vague reference to the convenience of witnesses also fails to make a convincing argument to transfer venue. *See Marshall*, 2018 WL 1449522, at *12 (holding that defendants failing "to identify even one witness that would be unduly inconvenienced" by the transferor venue was insufficient to "tip this factor" in defendants' favor).

In sum, none of Defendants' arguments regarding a § 1404(a) transfer is persuasive. Accordingly, the surviving claims will remain in this venue.

## III. Conclusion

For the foregoing reasons, Defendants' Motion To Dismiss is granted as to Defendant

Gerbing and as to the Wallkill and Otisville-related ADA claims. Dismissal is with prejudice.[7]

All other claims remain in the case and in this District.

The Clerk of Court is respectfully requested to terminate the pending Motion, (*see* Dkt.

No. 126). The Court will hold a Status Conference on November 13, 2019 at 10:30 a.m.

SO ORDERED.

Dated: September 25, 2019
White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

[7] Although Federal Rule of Civil Procedure 15(a)(2) provides that leave to amend shall be "freely give[n] . . . when justice so requires," the decision is "within the sound discretion of the district court," *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007), which may "deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party," *id.* A complaint may be dismissed with prejudice where the pleading has "substantive" problems and "[a] better pleading will not cure [them]." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

The Court concludes that Plaintiff, who is now counseled, has "no right to a [third] amendment—a [fourth] bite at the apple—particularly where, as here, [he] had ample opportunity to craft [his] complaints and [was] advised by the Court, prior to amending . . . , of certain pleading deficiencies and what the Court would require." *In re Merrill Lynch & Co., Inc.*, 273 F. Supp. 2d 351, 390 (S.D.N.Y. 2003), *aff'd*, 396 F.3d 161 (2d Cir. 2005). "There is no reason to suspect that, given another opportunity to amend, Plaintiff[] will be able to cure the substantive deficiencies" identified. *Estate of M.D. by DeCosmo v. New York*, 241 F. Supp. 3d 413, 433 (S.D.N.Y. 2017). Accordingly, the dismissed claims are dismissed with prejudice. *See Al-Qadaffi v. Servs. for the Underserved (SUS)*, No. 13-CV-8193, 2015 WL 585801, at *8 (S.D.N.Y. Jan. 30, 2015) (denying leave to amend where the plaintiff "already had one chance to amend his [c]omplaint, and there [was] still no indication that a valid claim might be stated if given a second chance"), *aff'd*, 632 F. App'x 31 (2d Cir. 2016).